Opinion issued May 11, 2017



In The

# Court of Appeals

For The

## First District of Texas

———————————————

NO. 01-16-00149-CV

———————————————

**AMIGOS MEAT DISTRIBUTORS, L.P., Appellant**

**V.**

**JULIAN GUZMAN AND CATHERINE MICHELE MONTEJANO,**
**Appellees**

On Appeal from the 295th District Court
Harris County, Texas
Trial Court Case No. 2013-25098

## O P I N I O N

This is an appeal from an award on a jury verdict in favor of an employee against his non-workers' compensation subscriber employer.

## BACKGROUND

Appellee Julian Guzman went to work as a truck driver for appellant Amigos Meat Distributors in 2008. As part of his job, he had to lift and carry frozen animal carcasses. In May 2011, Guzman was injured lifting a 175-pound frozen cow carcass. He and his wife, appellee Catherine Montejano, sued Amigos, a worker's compensation non-subscriber.

The jury found that Amigos's negligence proximately caused Guzman's injury, and awarded to him $287,809.94 in past medical expenses, $150,000 in past pain and mental anguish, and $150,000 in past physical impairment. The trial court entered judgment on that verdict.

Amigos does not challenge the jury's negligence finding on appeal. It challenges the damages findings, however, contending that (1) the medical expenses awarded are not supported by legally sufficient evidence of causation, and (2) Guzman was impermissibly awarded more damages than those "paid or incurred." Amigos also asserts Guzman's attorney made improper statements during closing argument appealing to the jury's prejudices against a corporate employer in favor of a worker, introducing incurable error into the trial.

We affirm.

## MEDICAL EXPENSES

On May 6, 2011, Guzman's supervisor, Humberto Arellano, told Guzman to unload three frozen cow carcasses from an 18-wheeler truck. Guzman followed the procedure he learned from watching others at Amigos, i.e., he wrapped his arms around the carcass, lifted it upward off the hook suspending it from the ceiling, shifted the carcass onto one shoulder, walked off the truck, bent over while turning, and laid the carcass down. Guzman lifted and carried the first two carcasses without incident. As he started to lift the third carcass, which bore a tag indicating it weighed 175 pounds, off the hook, Guzman "felt something like snap, pain and burning sensation in [his] lower back." He testified that the pain in his lower back was immediate. He began walking with the carcass, still feeling a burning sensation in his lower back. Then his legs started to give way, "like gelatin or something," and he dropped the carcass.

Guzman testified that Arellano had witnessed this incident, and Guzman told him, "I think I hurt myself. I can't feel my legs." Guzman dropped to the ground, and Arellano had to help him load the last carcass onto a pallet. Despite Guzman telling Arellano that he was injured, and that he could not shake it off, Arellano told Guzman that he needed to go make his deliveries. Amigo then assigned Guzman a helper, a young teenager. The helper was small and unable to do most of the lifting, so Guzman was expected to continue doing so himself.

3

Before his May 6, 2011 injury, Guzman had never experienced any problems with his back and had never been injured at work. Guzman's wife Montejano testified that, on the evening of May 6, Guzman came home from work in pain. The following day, he could not get out of bed without his brother's help. His family took him to see Dr. Arango, a chiropractor. Arango's records contain the following notes:

> During the initial consultation, Mr. Julian Guzman stated that he injured his low back secondary to a work-related injury which took place on 5/6/11. The patient reports that he lifted a steer carcass and experienced low back pain. At the moment he felt he was going to collapse due to pain, the patient reported it to his supervisor and was asked to only drive along with a helper. Mr. Guzman finished the day worse and went home. Today he decided to seek care in our clinic.
>
> . . . .
>
> From the evaluation of Mr. Guzman's history, subjective complaints and the objective findings from orthopedic, neurologic and radiographic examinations, it is evident from a chiropractic viewpoint, that this type of injury would have resulted from the type of work related injury this patient suffered on 05/06/11.

Arango provided Guzman with a disability certificate that day, which stated he was "totally incapacitated." Guzman presented that at work. Francisco Moreno, Amigos's manager or owner, told Guzman to call when he needed anything, and that he "was one of the best workers there so they were going to take care of" him. On May 11, 2011, Arango reclassified Guzman as "partially incapacitated," and indicated that he was restricted to light duty.

4

Because Arango thought Guzman might recover with conservative chiropractic care, Guzman had his back injury treated with physical therapy, chiropractic care, and epidural steroid injunctions. He did not get better, and began to get overwhelmed by the constant doctor's appointments. He had to take pain medications three times a day.

True to its promise, Amigos paid Guzman's medical bills for the first three months after his injury. Amigos discontinued payments in August 2011. Amigos did not let Guzman know, but refused payment to Dr. Chanani, his pain management doctor for several scheduled spinal injections.

When Guzman visited Amigos's office in August 2011, Amigos's management showed him a video, obtained by a private investigator, of Guzman carrying a laundry basket. Amigos then told him that they would no longer pay his medical bills and terminated his employment. Both Guzman and his wife testified that he had carried the laundry basket because his doctor had ordered him to try walking for five or ten minutes per day and ease into lifting.

For the next two years, Guzman regularly went to Ben Taub Hospital and various doctors. At one point, Ben Taub placed him on suicide watch after he reported, "I can't bear the pain. I just want to kill myself." Montejano, Guzman's wife, testified that Guzman was constantly in pain after his May 6, 2011 injury.

5

He was diagnosed with depression, constantly took prescription pain pills, and ceased his daily involvement with their children.

On October 30, 2013, Guzman first visited Doctor Reynolds, a surgeon Guzman was referred to by another doctor who believed Guzman might require surgical intervention. Reynolds discussed with him his options and possible outcomes for each. Reynolds did not recommend Guzman first pursue more conservative, non-surgical treatments because Guzman had already tried the things Reynolds would recommend, i.e., physical therapy and steroid injections. Although Guzman was hesitant, he ultimately opted to have surgery. Reynolds testified that Guzman and his wife expressed that they were both concerned about how his pain was affecting his psyche and life, and he wanted to return to work.

On May 8, 2014, Reynolds performed surgery, described as discectomy and a fusion with some placement of hardware, at Guzman's L4-5 disc. When asked about the causal links between Guzman's workplace injury, his back pain, and the need for surgery, Reynolds testified—based on a reasonable medical probability— that the May 6, 2011 injury caused Guzman a significant amount of pain that persisted. He also testified that, based on the MRI images he reviewed, Guzman had some preexisting damage to the L4-5 disc. While it is impossible to tell from MRI imaging when and how the damage to Guzman's disc was caused, Reynolds noted that, based on Guzman's medical history, any preexisting damage was

6

asymptomatic. Thus, Reynolds opined that the May 6, 2011 lifting injury caused a symptomatic injury and caused the ongoing pain that persisted after that date.

Guzman was told that his activities would be restricted for about eighteen months, but he testified that he felt better almost immediately post-surgery. He was able to walk without the assistance of a cane for the first time since being injured. Within a month, he went to work at a Subway sandwich restaurant, which he was still doing at the time of the September 2015 trial. While he still had lingering issues, such as not being able to stand for too long and not being able to bend down to tie his shoes, Guzman testified that his life was greatly improved.

## A. Causation

The judgment awards Guzman $287,809.94 in past medical expenses. In its first issue, Amigos contends that these expenses were "unrecoverable as a matter of law" because Guzman "fail[ed] to provide the requisite causation evidence."

### 1. Applicable Law and Standard of Review

"To establish causation in a personal injury case, a plaintiff must prove the defendant's conduct caused an event, and that event caused the plaintiff to suffer compensable damages." *Hospadales v. McCoy*, No. 01-16-00239-CV, __ S.W.3d __, __, 2017 WL 117327, at *8 (Tex. App.—Houston [1st Dist.] Jan. 12, 2017, no pet.) (citing *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995)). The causal link between the event sued upon and the plaintiff's injury must be

shown by competent evidence. *Guevara v. Ferrer*, 247 S.W.3d 662, 666 (Tex. 2007). "The causal connection between a defendant's negligence and a plaintiff's injuries cannot be based on mere conjecture, speculation, or possibility." *Hospadales*, __ S.W.3d at __, 2017 WL 117327, at \*8 (citing *Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995)). When a plaintiff claims damages for a medical condition, the cause of which is not within the common knowledge and experience of jurors, expert testimony is necessary to show the defendant's conduct caused that condition. *JLG Trucking, LLC v. Garza*, 466 S.W.3d 157, 162 (Tex. 2015).

To constitute evidence of causation, a medical expert's opinion must rest in reasonable medical probability. *Crye*, 907 S.W.2d at 500; *LMC Complete Auto., Inc. v. Burke*, 229 S.W.3d 469, 478 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). However, a plaintiff, "is not required to establish causation in terms of medical certainty nor is he . . . required to exclude every other reasonable hypothesis." *Bradley v. Rogers*, 879 S.W.2d 947, 954 (Tex. App.—Houston [14th Dist.] 1994, writ denied). "Whether expert testimony on causal connection rests upon reasonable medical probability must be determined by the substance and context of the testimony rather than semantics or use of a particular term or phrase." *Thompson v. Stolar*, 458 S.W.3d 46, 57 (Tex. App.—El Paso 2014, no pet.) (citing *Crye*, 907 S.W.2d at 500).

Evidence is legally sufficient if it "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We will conclude that the evidence is legally insufficient to support the finding only if (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810. When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference to support it. *Id.* at 822. We credit favorable evidence if a reasonable juror could and disregard contrary evidence if a reasonable juror could not. *Id.* at 827.

### 2. Analysis

Amigos argues that Guzman "failed to supply the evidence necessary to create the required causal connection between those surgery-related, 2014 medical expenses awarded, and the 2011 incident sued upon." It focuses on excerpts from Dr. Reynolds's deposition, which was not introduced into evidence but attached to Amigo's motion for new trial, stating that Guzman likely had a preexisting back condition that necessitated surgery.

Preliminarily, Guzman responds with the observation that excerpts from Reynolds's deposition upon which Amigos relies upon was not entered into evidence, and that Amigos has not complained about its exclusion on appeal. Guzman also contends that Amigos's causation argument does not comport with the applicable standard of review, as Amigo ignores Reynolds's trial testimony that sufficiently demonstrated a causal link between Guzman's 2011 injury and his 2014 surgery. Finally, Guzman points out that (1) Reynolds operated to address Guzman's pain, not his preexisting asymptomatic disc degeneration, (2) Reynolds testified that Guzman's back pain was caused by his workplace lifting injury, and (3) under Texas law, medical expenses caused by injury aggravation of a preexisting condition are compensable. We agree with Guzman that he presented sufficient evidence of causation.

As Guzman notes, Amigos's brief focuses on Reynolds's statements about MRI film of Guzman's back from different periods indicating that Reynolds could not determine when Guzman's disc degeneration had taken place. Importantly, though, Reynolds testified that Guzman's medical history largely informed his causation opinion that whatever preexisting condition existed before May 6, 2011 was asymptomatic, and that, immediately after the May 6, 2011 injury, Guzman suffered constant and severe pain until it was remedied by his back surgery.

We recently considered, and rejected, a causation argument similar to Amigos's. In *Hospadales v. McCoy*, the defendant argued that the evidence was insufficient to establish that plaintiff's back and neck injuries were caused by a 2013 automobile accident at issue rather than by a 2010 automobile accident. ___ S.W.3d at __, 2017 WL 117327, at *3–4. The defendant relied heavily on the fact that the "MRIs taken of [plaintiff's] back and neck, following the 2010 accident, showed essentially the same injuries as those indicated in the MRIs taken following this [2013] accident." *Id*. The plaintiff, however, testified that he had recovered from his injuries from the 2010 accident before the 2013 accident, and that it was the 2013 accident that caused the pain that caused him to have surgery. *Id*.

Plaintiff's expert in *Hospadales*, Dr. Rodriguez, testified that, "based on a reasonable degree of medical probability, the 2013 accident aggravated [plaintiff's] preexisting injuries in his lower back and neck." *Id*. We concluded that Rodriguez's causation opinion, based largely on the asymptomatic nature of plaintiff's preexisting condition prior to the 2013 accident—in conjunction with plaintiff's testimony about the 2013 accident and the pain he suffered only afterwards—was sufficient to establish causation:

> Rodriguez reviewed [plaintiff's] past medical records relating to his back and neck injuries. These included the MRI report related to the back and neck injuries [plaintiff] sustained in the 2010 accident. Dr. Rodriguez acknowledged that the MRI findings from 2013 indicated

11

nearly the same injuries as the 2010 MRI. However, Dr. Rodriguez explained that "we don't treat MRIs." He continued, "The MRIs are done to help us rule out problems or be assertive of diagnosis, but we always treat the patient." Dr. Rodriguez testified that [plaintiff] was "asymptomatic before this accident and his symptoms are the ones that objectively indicates that he has an aggravation of a previous injury based on the MRIs." In other words, Dr. Rodriguez testified that, while MRIs are used as a diagnostic tool, what the patient reports is also important in diagnosing and treating a patient.

Here, [plaintiff] reported that, before the 2013 accident, he was no longer experiencing any back or neck problems from the 2010 accident. However, after the 2013 accident, McCoy reported experiencing back and neck pain. This indicated to Dr. Rodriguez that the report of new symptoms following the 2013 accident supports the conclusion that the accident aggravated McCoy's previous injuries from 2010.

. . . .

We therefore hold that Dr. Rodriguez's causation testimony was legally sufficient.

*Id.*

The Fourteenth Court of Appeals also recently considered, and rejected, an argument essentially identical to Amigos's here. In *Katy Springs & Manufacturing, Inc. v. Favalora*, the plaintiff suffered an on-the-job injury that he testified caused long-term chronic neck pain and numbness in his arm. 476 S.W.3d 579, 587 (Tex. App.—Houston [14th Dist.] 2015, pet. denied). Similar to Guzman's testimony here, the plaintiff in *Favalora* explored conservative treatments for his pain, including epidural steroid injections, and prescription pain medications. See *id.* Finally, almost three years after the injury, the plaintiff in

12

*Favalora* had back surgery. *See id.* A jury awarded him damages from his employer, a non-subscriber to workers' compensation insurance. *Id.* On appeal, his employer argued that the evidence of causation was legally insufficient and that the plaintiff's injuries were preexisting. *Id.* at 587, 591–92. The Fourteenth Court of Appeals disagreed, concluding that—assuming expert causation testimony was required—the plaintiff's doctor's testimony opining that the workplace incident aggravated a preexisting condition in his neck "which caused it to become systematic" was legally sufficient:

> To the extent Katy Springs argues that expert testimony was necessary to establish causation, we disagree. . . . Here, prior to the accident, [plaintiff] was able to do manual labor. He was able to participate in athletic endeavors, such as volleyball, swimming, and working out. He was essentially pain free. After the accident he suffered excruciating pain and had to undergo spinal surgery that fused several of his vertebrae. . . . On this record, the jury could have concluded without expert testimony that the injuries [plaintiff] suffered were caused by Katy Springs' negligence.
>
> . . . .
>
> Moreover, contrary to Katy Springs' assertions, the jury's finding on causation is supported by expert medical evidence. Dr. Bartholomew testified by video deposition. During his testimony the following exchange occurred:
>
> > [Q.] Do you believe that [plaintiff], based on what he's told you, was injured at that time?
> >
> > [A.] Yes, sir.
> >
> > [Q.] Based on reasonable medical probability, what is your opinion on what injuries Joseph sustained—injuries or conditions as a result of that incident [at Katy Springs]?
> >
> > ...

13

> [A.] As far as the cervical spine, I think he had an aggravation of a preexisting condition in his neck which caused it to become symptomatic.

> This expert testimony is legally sufficient to support the trial court's judgment.

*Id.* at 591 (citing *Wal–Mart Stores Tex., LP v. Crosby*, 295 S.W.3d 346, 352–53 (Tex. App.—Dallas 2009, pet. denied) (doctor's testimony that defendant's negligence resulted in an aggravation of a preexisting condition was legally sufficient to support the trial court's findings on causation)).

Similar to the evidence in *Hospadales* and *Favalora*, in this case, the evidence reflects that—to the extent Guzman suffered from a degenerative back condition *before* his May 6, 2011 workplace injury—that condition was asymptomatic. Guzman testified that he experienced immediate back pain while lifting a heavy carcass at work, and continued to suffer severe pain after that until he had back surgery in 2014. He had never had back problems before May 6, 2011. This testimony is consistent with his wife's testimony and the medical history in his medical records, including the history taken by his chiropractor Aarando on May 7, 2011—one day after he was injured. Guzman's surgeon Reynolds testified that he recommended surgery because of the debilitating pain Guzman begin experiencing with his lifting injury, pain that he had not been able to alleviate with more conservative treatments. We conclude that legally sufficient causation evidence links the 2011 injury to Guzman's 2014 surgery. Thus, there is

14

legally sufficient evidence to support the award of medical expenses related to Guzman's back surgery.

We overrule Amigos's first issue.

## B. Medical Expenses

In its second issue, Amigos argues that the trial court erred by "permitting admission of certain alleged medical expenses in excess of those actually 'paid or incurred' in violation of CPRC § 41.0105." The trial court admitted evidence of the past medical expenses totaling $287,809.94, and the jury awarded Guzman that amount. According to Amigos, this amount is artificially inflated because the medical providers were only paid $76,335.60, with the additional $211,383 going to a "third-party speculator—HMRF—which invests in other parties' lawsuits by supplying monies which allow injured-but-uninsured plaintiffs to receive medical care from others (HMRF itself is not a medical provider) in advance of their lawsuits being resolved."

Guzman responds that "the gist of Amigos's argument is that its complaint of inadmissibility was demonstrated by documents that were not presented to the trial court until *after* trial had already concluded and also unauthenticated and inadmissible." Accordingly, Guzman argues, the scope of this "Court's review does not include these materials." In any event, Guzman asserts that the trial court did not abuse its discretion by admitting Guzman's medical bills into evidence.

15

Guzman's filed and served, pre-trial, billing records and affidavits reflecting the amounts already paid to each medical provider, and the amounts unpaid that HMRF was entitled to collect. Amigos moved to strike these affidavits, arguing that they did not reflect what was "paid or incurred" because the medical providers were not to be paid anything additional; instead, the remaining balance was owed to HMRF.

Guzman responded to the motion to strike, contending that HMRF's payments to Guzman's medical providers were not payments on Guzman's account. Instead, HMRF has "purchased the accounts from the healthcare providers," giving HMRF "the medical providers' rights, title, and interest in the account." Thus, unlike with insurance programs, "Guzman remains liable for the full amount of the medical providers' bills, regardless of what HMR[F] paid the medical providers." Guzman's response attached, among other records, an "Affidavit of Purchase of Accounts Receivable by Factoring Entity," executed by HMRF's record custodian and explaining the HMRF had purchased the receivables from three of Guzman's medical providers.

The record reflects that, at the trial court's request, Guzman submitted—for in camera review—a copy of the assignment agreements "between Plaintiff Julian Guzman, and all the medical providers regarding his surgery, funded by HMRF." These assignments reflected that Guzman had assigned his potential recovery for

16

medical expenses to three of his medical providers. In the letter transmitting these assignment documents to the court, Guzman's counsel stated that there are no agreements between Guzman and HMRF. He noted, however, that he—as Guzman's counsel—had signed an agreement with HMRF regarding Guzman, and he enclosed a copy of that agreement for the court as well.[1] The court denied Amigo's request to strike Guzman's medical expense affidavits.

At the close of the trial evidence, Amigos requested an instructed verdict on the past medical expenses because "the expenses that have been admitted into evidence over our previous objection are improper and are not actually paid or incurred because of the involvement of the factoring company and the fact that the jury is not being told the actual amount that has been paid and the only amount that will be paid to the actual health-care providers but instead is being given an amount of medical expenses that were never paid to the providers, never will be paid to the providers, and are only being sought through assignment by a factoring company." The trial court overruled this request because Guzman owes the full amount of the bills admitted at trial to either the medical provider or HMRF:

---

[1] Amigos had requested any agreement between HMRF and Guzman or his attorney be produced in pre-trial discovery. Guzman responded to the discovery request with, "Not relevant and will not lead to admissible evidence." Amigos argues here that Guzman's discovery response amounted to a misrepresentation that no such agreement existed, which prevented Amigos from obtaining a copy of the agreement between HMRF and Guzman's counsel until after trial. Nothing in the record supports Amigos assertion that Guzman denied this agreement existed, however, and Amigos did not raise this as a newly discovered evidence point in its motion for new trial.

It's my understanding, from looking at the assignments, that if the Plaintiff were to recover the full amount of the medical expenses, meaning, the bills that have been submitted by exhibit on behalf of the Plaintiff that the Plaintiff would be obligated to pay that money to the health-care provider or the factoring company since it's the one that has been assigned the health-care.

Guzman's counsel confirmed that the court's understanding was correct.

This "paid or incurred" issue was raised again at the hearing on Guzman's motion to enter judgment on the jury's verdict. Amigos argued that it had recently obtained "the contract between [plaintiff's counsel] and the factoring company [HMRF] and the materials that are associated with that contract." Amigos argued that these materials together showed (1) Guzman would not owe HMRF anything if he had lost his case against Amigo, and (2) plaintiffs' counsel gets to subtract his fee from any award to Guzman first, and then he and HMRF share together the risk that the jury would not award enough to fully pay Guzman's medical expenses.

Guzman argued that Amigos's understanding of the situation was incorrect. According to Guzman, the "materials that are associated with" the HMRF contract cited by Amigos was actually a flyer that neither Guzman nor his counsel had seen before, and it reflected terms that were not a part of Guzman's counsel's agreement with HMRF. Guzman contended that he "had actually incurred his billing obligations because he received the medical care, was billed for it, has provided no payments to cover it, and could be subject to suit for nonpayment." Guzman's counsel again confirmed to the court that if it entered judgment on the jury's

18

verdict—including awarding to Guzman his past medical expenses—"the full amount of the bills are going to be paid to HMR[F]." The court ruled in Guzman's favor and entered judgment on the jury's verdict, including the $287,809.94 in past medical expenses.

Amigos filed a motion for new trial, again contending that the trial court "allowed the admission of certain medical charges in excess of that which was 'paid or incurred.'" Amigos asserted that the actual amount paid to health care providers was $76,335.60 of the $287,809.94 awarded. Amigos relied on and attached as evidence: excerpts from Dr. Reynold's deposition, the HMRF flyer (first presented post-trial and which Guzman and his counsel disavowed), the contract between HMRF and plaintiff's counsel, plaintiff's counsel's contingent fee agreement with the plaintiffs, and assignment contracts under which Guzman assigned his right of recovery to several medical providers.

Guzman responded that Amigo's argument should be rejected, because Guzman's assignments to his medical providers impose a payment obligation on him and because there is no evidence of a contract prohibiting the medical providers from charging Guzman the full value of services rendered and no evidence of a contract prohibiting HMRF from collecting the full value of services rendered. Thus, Guzman argued, the trial court properly admitted the medical bills into evidence. The trial court agreed, denying Amigos's motion for new trial.

## 1.    What Evidence Should this Court Consider?

The parties disagree about what evidence may properly be considered by this Court in reviewing the trial court's decision to admit Guzman's medical bills.  In its brief here, Amigos relies heavily on an undated flyer it attached to post-trial filings advertising that HMRF does not recover money in cases unless the injured party wins or settles the case.  Amigos characterizes this as part of HMRF's agreement with Guzman's counsel and states that HMRF had supplied this flyer to Guzman's lawyer.  Amigos also relies upon an excerpt from Reynolds's deposition in which he states that he did not know who receives any recovered funds in excess of what HMRF paid him for an assignment of Guzman's bill.

Guzman represented to the trial court, as it does here, that neither Guzman nor his counsel had ever seen the flyer Amigos relies upon, and that its terms were not a part of Guzman's attorney's agreement with HMRF.  Guzman further argues here that this flyer, as well as the deposition excerpts—both presented to the trial court *after* the court had admitted the medical expense records Amigos objects to—cannot be considered evidence in reviewing the trial court's earlier decision to admit the records.  We agree.

On October 4, 2014, almost one year before trial, Guzman's counsel provided the trial court with copies of (1) Guzman assignments to his medical providers, and (2) Guzman's counsel agreement with HMRF.  Amigos challenges

20

the admission of medical billing records totaling $287,809.94 that were introduced and admitted during the September 2015 trial.

Although Amigos claims that the flyer was discovered post-trial and is relevant (while Guzman claims that it is not), Amigos does not complain on appeal about the trial court's denial of its *post-trial* motion for judgment notwithstanding the verdict or motion for new trial (motions that relied on this evidence).[2] Rather, it argues that the medical expense evidence should not have been introduced *at trial*. Guzman argues that the flyer was not relevant, competent, or authenticated, and that we should not consider the flyer or deposition excerpts that were not before the trial court when it made the decision Amigos complains of on appeal. *See generally Hornell Brewing Co. v. Lara*, 252 S.W.3d 426, 429 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (holding that determination whether trial court abused its discretion limited to information available to trial court at time of ruling, not subsequent events); *In re A.W.P.*, 200 S.W.3d 242, 245 (Tex. App.—Dallas 2006, no pet.) ("Larry relies solely on evidence he presented to the trial court in his motion for new trial. However, Larry attacks only the trial court's decision to grant

---

[2]    A new trial based on newly discovered evidence requires the movant to show: "(i) admissible relevant evidence introduced on the hearing for new trial demonstrating the existence of newly discovered evidence relied upon; (ii) no knowledge of such evidence until after the conclusion of the trial and that such evidence could not have been discovered prior to the trial with the exercise of due diligence; (iii) such evidence was not cumulative or to be used for impeachment; and, (iv) such evidence would probably produce a different result if a new trial was granted." *Rivera v. Countrywide Home Loans,* 262 S.W.3d 834, 844 (Tex. App.—Dallas 2008, no pet.).

21

judgment on the deemed admissions. In determining whether the trial court properly granted judgment on the deemed admissions, we consider only the evidence before the trial court at the time it made that decision."); *In re Harvest Cmtys. of Hous., Inc.*, 88 S.W.3d 343, 349 (Tex. App.—San Antonio 2002, orig. proceeding) ("A judgment must take its validity from the action of the court at the time it is rendered and not from what persons may or may not do after the court has rendered the judgment. . . . We can only consider the record that was before the trial court at the time of the hearing in determining whether the trial court's ruling was [an abuse of discretion]."); *Clark v. Noyes*, 871 S.W.2d 508, 519 n.5 (Tex. App.—Dallas 1994, no writ) ("'We are required to consider only evidence tendered or admitted at the time of the . . . hearing.'") (citation omitted).

We need not determine if the flyer is relevant, competent, or authenticated, because we agree that we should disregard the flyer and deposition excerpts relied upon by Amigos that were not before the trial court when it admitted Guzman's medical billing records.

### 2. The Trial Court did not Abuse its Discretion by Admitting Guzman's medical billing records.

We review a trial court's admission of evidence under the abuse-of-discretion standard. *E.g.*, *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005); *Dupree v. Boniuk Interests, Ltd.*, 472 S.W.3d 355, 369 (Tex. App.—Houston [1st Dist.] 2015, no pet.). A trial court abuses its discretion if it acts without reference to any

22

guiding rules or principles or its decision is arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

At issue here is the proper interpretation of the "paid or incurred" provision of the Texas Civil Practice and Remedies Code:

> § 41.0105. Evidence Relating to Amount of Economic Damages
>
> In addition to any other limitation under law, recovery of medical or health care expenses incurred is limited to the amount actually paid or incurred by or on behalf of the claimant.

TEX. CIV. PRAC. & REM. CODE ANN. § 41.0105 (West 2013).

The Texas Supreme Court first interpreted this statutory language in *Haygood v. De Escabedo*, 356 S.W.3d 390 (Tex. 2011). There, health-care providers billed Haygood a total of $110,069.12 for treatment of car-wreck injuries. *Id*. at 392. Because Haygood was covered by Medicare Part B, and because federal law prohibits health care providers from charging Medicare patients more than Medicare deems reasonable, Haygood's providers adjusted their bills downward, leaving a total amount due of $27,739.43. *Id*. The trial court allowed Haygood to introduce evidence of the full amounts initially billed by his providers, and the jury awarded the full amounts as past medical expenses. *Id*.

The supreme court held that allowing evidence of the initially billed amounts was improper. *Id*. at 396. The court also interpreted the "actually paid and incurred" language in section 41.0105 to mean "expenses that have been or will be paid, and excludes the difference between such amount and charges the service

23

provider bills but has no right to be paid." *Id.* The court also articulated the standard as "limit[ing] a claimant's recovery of medical expenses to those which have been or must be paid by or for the claimant." *Id.* at 398. The court thus concluded that only evidence of recoverable medical expenses—those expenses that "have been or must be paid by or for the claimant"—is admissible. *Id.* at 398–99. Evidence of charges for which the provider is not entitled to payment is "irrelevant to the issue of damages" and inadmissible. *Id.* at 398.

In the underlying case here, Guzman assigned to his medical providers his right to recover medical expenses from Amigos. His medical providers, in turn, sold Guzman accounts to HMRF—an accounts receivable financing (or "factoring" company)—at a discounted rate.[3] Guzman's obligation to pay his medical providers then shifted to an obligation to pay HMRF as purchaser of the account.

A variable is thus present in this case that *Haygood* does not directly address—namely, the involvement of a third-party factoring company as an assignee of the medical providers that renders different the *amount paid the medical providers* and the *amount due from or on behalf of the plaintiff* to the

---

[3]    In its brief, Amigos refers to Guzman's past medical expenses assigned to HMRF as "Inflated Charges," and refers to the contractual arrangements as a "puppet show," between "complicit providers," to implement an "elaborate scheme." Nothing in the record, however, supports the assertion that the amounts billed by the medical providers were not reasonable, customary, or inflated for purposes of the HMRF agreement. Rather, the record evidence is that the medical expenses were reasonable and necessary.

24

factoring company. The Fourteenth Court of Appeals has, however, recently interpreted section 41.0105 in light of *Haygood* in a similar situation involving medical providers who sold, at a discount, their accounts to a third-party factoring company:

> Favalora entered into contracts with several of his health care providers. Pursuant to these contracts, Favalora assigned to the health care providers his interest in any proceeds that might be recovered as a result of his pending lawsuit. Favalora also granted the providers a security interest in his potential tort recovery. MedStar then purchased, at a discount, the health care providers' accounts receivable, including the providers' respective interests in the potential tort recovery and the liens on those interests. . . . [T]here is no evidence of any contract that prohibited the health care providers from charging Favalora the full value of the services rendered. Nor is there any evidence of a contract prohibiting MedStar from collecting the full value of the services rendered. To the contrary, the evidence considered by the trial court suggests that Favalora remained liable for the full value of the services rendered.

*See Katy Springs & Mfg. v. Favalora*, 476 S.W.3d 579, 601–02 (Tex. App.—Houston [14th Dist.] 2015, pet denied).

As here, *Favalora* involved a suit against an employer who argued that "the trial court erred in admitting invoices showing the full amounts charged by the medical providers rather that the amounts medical providers received in return for selling their accounts receivable" to a factoring company. *Id*. at 601. The *Favalora* court acknowledged that the "factual situation before us does not fit neatly into section 41.0105 of the *Haygood* court's ruling." *Id*. at 601. The court ultimately concluded, however, that "[i]n a factoring case, where the record

25

indicates that the claimant remains liable for the amounts originally billed by the medical provider, such amounts are recoverable medical expenses under section 41.0105, and evidence showing the amounts billed by the medical provider is admissible." *Id.* at 604. The record reflects that Guzman remains liable for the amounts originally billed by the medical providers; thus, evidence showing the amounts billed by his medical providers is admissible.

We overrule Amigos's second issue.

## C. Improper Jury Argument

In its third issue, Amigos argues that "improper questioning and argument" by Guzman's counsel constituted "incurable error." "To obtain reversal of a judgment on the basis of improper jury argument, a complainant must prove (1) an error; (2) that was not invited or provoked; (3) that was preserved at trial by a proper objection, motion to instruct, or motion for mistrial; (4) that was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the trial court; and that (5) the argument by its nature, extent, and degree constituted reversibly harmful error." *Jones v. Republic Waste Servs. of Tex.*, 236 S.W.3d 390, 402 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (citing *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839 (Tex. 1979)). Reversal is proper only upon a showing that "the probability that the improper argument caused harm is greater

26

than the probability that the verdict was grounded on the proper proceedings and evidence." *Reese*, 584 S.W.2d at 840.

Amigos specifically complains of the following:

*Plaintiff's Opening Statement*: "I implore you to believe in better. Texas workers deserve better; and when you get your verdict, believe in better and do not reward the defendant's conduct with a small verdict."

*Direct Examination of Amigos's Office Manager*: "And even today, you have Amigos' employees show up at Subway and try to videotape and spy on Mr. Guzman?"; and "So, it's a coincidence that people are in their backyards looking into [Plaintiff's] windows?"

*Plaintiffs' Closing Argument:* Brian—he's volunteering. He's doing it for free . . . . so we're not huge. We're not Baker Botts. We're two lawyers helping poor workers get justice. Now you see what you have to do. Now, you see what a worker has to go through to get justice. This process here has taken a couple of days at trial, has taken a couple of days. This litigation has gone on for two years. Mr. Markle has taken depositions and grilled Julian [Guzman], his wife, and called him a liar, a cheat, and a fraud. Now he's calling him a criminal. Can you imagine what an injured worker has to do to get justice, to go through all of this and be called a criminal because you got hurt at work? That's outrageous. It's outrageous conduct.

In response, Guzman notes that Amigos did not object to all of these statements at trial, and he argues that none of the statements presented were preserved or incurable error.

### 1.    Surveillance Questions

It was undisputed that Amigoes used video surveillance on Guzman and his family for at least two weeks, resulting in the video of Guzman carrying a laundry basket that formed the basis of Amigos's claim that Guzman was not injured.

27

After Guzman's wife testified that they felt they were still being followed, Mr. Cantu, Amigos's office manager, was asked about the surveillance. Cantu testified that an employee whose name he did not remember implied Guzman was "somehow lying about his situation," so Amigos decided to hire an investigator. The investigator was paid between $2,500 and 3,000 to follow Guzman and his family for about two weeks. After this information was solicited, the following exchange took place between Guzman's counsel and Cantu:

> Q. You followed -- you had -- you hired an investigator to follow around -- follow him and his family around to show that he was not injured, right?
>
> A. I'm not interested about the family, only him.
>
> Q. And why is that?
>
> A. Because he is the employee who works with us and he is the right person.
>
> Q. And even today, you have Amigo's employees show up at Subway and try to videotape and spy on Mr. Guzman?
>
> . . . .
>
> Q. Even today is Amigo's employees still following around Mr. Guzman and his family?
>
> A. Nothing at all with the family, and ever since, we have never hired again any service to follow him.
>
> Q. So, it's a coincidence that people are in their backyards looking to their windows?
>
> [Amigos's counsel]: Objection, Your Honor. There is no evidence of that.
>
> THE COURT: Sustained.
>
> [Amigos's counsel]: I ask for an instruction to disregard. That is absolutely outrageous.

THE COURT: Well, the question wasn't answered, so I've sustained the objection to the question.

Amigos argues that, with these statements, Plaintiffs' counsel "insinuated that Amigos had actually dispatched henchmen into Plaintiff's backyard, so as to 'look . . . into his windows.'" It further contends that there was no evidence to support these "inflammatory and outrageous assertions." And that "a new trial is likewise appropriate where plaintiff's counsel has made statements before the jury which question the tactics or integrity of the defendant and/or its counsel, without evidentiary support in the record substantiating that such wrongdoing actually occurred." (citing *State v. Jauernig*, 395 S.W.2d 923, 926 (Tex. App.—San Antonio 1965, writ ref'd, n.r.e.); *Texas & Pacific Ry. Co. v. Jefferson*, 131 S.W.2d 175, 176–77 (Tex. App.—El Paso 1939, no writ)).

In response, Guzman points out that only one of these two surveillance questions was answered, and it was answered only partially. Specifically, when asked about whether *Amigos's employees* are still following the Guzman family, Cantu responded that "ever since, we have never *hired again any service* to follow him." (emphasis added). Guzman also notes that this was not a new topic, but follow up on testimony that the family still thought it was being followed today.

Given the record evidence that Amigos engaged in surveillance and recording of Guzman's family and that the trial court's sustained Amigo's "outside the record" objection to the question about whether Amigos was still engaged in

surveillance, we conclude that Amigos' has not demonstrated that this questioning of Cantu amounted to incurable, improper argument. *E.g., Nguyen v. Myers*, 442 S.W.3d 434, 441–42 (Tex. App.—Dallas 2013, no pet.) ("Incurable statements are rare and generally encompass arguments that strike at the courts' impartiality, equality, and fairness because they "inflict damage beyond the parties and the individual case under consideration if not corrected.").

## 2. Opening Statement and Closing Argument

Amigo's objection during Guzman's counsel's opening statement was sustained during the following exchange, and Amigos renews his complaint about this statement on appeal:

> There are no excuses for the defendant to choose to cause mayhem at the workplace. They have to be held accountable. The simple truth is Julian [Guzman] has suffered through this because of the failure to provide the proper help and the proper equipment. I implore you to believe in better. Texas workers deserve better; and when you get your verdict, believe in better and do not reward the defendant's conduct with a small verdict --
>
> [Amigo's counsel]: Your Honor, I object.
>
> Sustained.
>
> [Amigo's counsel]: That's argument.
>
> Sustained as to argument.
>
> [Guzman's counsel]: -- just a fair verdict based on the evidence. Remember, conduct rewarded is conduct repeated. Now let's get to work. Thank you.

Lastly, Amigos challenges the following from closing arguments:

Brian—he's volunteering. He's doing it for free . . . . so we're not huge.  We're not Baker Botts. We're two lawyers helping poor workers get justice. Now you see what you have to do. Now, you see what a worker has to go through to get justice.  This process here has taken a couple of days at trial, has taken a couple of days.  This litigation has gone on for two years. [Amigo's counsel] has taken depositions and grilled Julian [Guzman], his wife, and called him a liar, a cheat, and a fraud. Now he's calling him a criminal.  Can you imagine what an injured worker has to do to get justice, to go through all of this and be called a criminal because you got hurt at work?  That's outrageous. It's outrageous conduct.

Amigos argues that, "Viewed as a whole, then, th[ese] Prejudicial Statements by Plaintiff's counsel constitute not just reversible error, but incurable error, in that the Statements improperly appealed to the Jury's prejudices by i) urging them to favor the 'worker' Plaintiff over his corporate employer Amigos, ii) making unsupported allegations that Amigos and its counsel engaged in 'outrageous conduct' which impermissibly and continuously harassed the 'worker' Plaintiff, and iii) urging the Jury to make its verdict sufficiently large to punish Amigos for this entirely unproven 'outrageous misconduct' committed against a 'Texas worker.'"

Guzman asserts that Amigos has the burden to prove that complained-of remarks were not invited or provoked. *See Standard Fire*, 584 S.W.2d at 839; *Cent. Nat'l Gulfbank v. Comdata Network, Inc.*, 773 S.W.2d 626, 628 (Tex. App.—Corpus Christi 1989, no writ). And that parties have a right to fairly respond to arguments by opposing counsel, so a fair response to opposing

31

counsel's arguments presents no error. *See Magaline v. J.V. Harrison Truck Lines, Inc.*, 446 S.W.2d 920, 926 (Tex. Civ. App.—Houston [14th Dist.] 1969, writ ref'd n.r.e.).

The Texas supreme court has admonished that the proper focus in evaluating whether an argument is incurable is "the amount of harm from the argument":

> [W]hether the argument, considered in its proper setting, was reasonably calculated to cause such prejudice to the opposing litigant that a withdrawal by counsel or an instruction by the court, or both, could not eliminate the probability that it resulted in an improper verdict.

*Living Centers of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 680 (Tex. 2008). For example, in *Penalver*, the plaintiff's attorney representing the family of an elderly woman who died at a Living Centers' nursing home, "compared Living Centers' lawyer's attempts to minimize damages [awarded] to a World War II German program in which elderly and infirm persons were used for medical experimentation and killed." *Id.* The supreme court held that this argument fits within the rare category of argument that "strikes at the appearance of and the actual impartiality, equality, and fairness of justice rendered by courts." *Id.* at 681. It is "incurably harmful not only because of its harm to the litigants involved, but also because of its capacity to damage the judicial system." *Id.*

While counsel must "confine argument strictly to the evidence and to the arguments of opposing counsel," and "[a]ppeals to passion and prejudice are

improper," improper argument is not incurable unless it is shown that "the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on the proper proceedings and evidence." *Jones v. Republic Waste Servs. of Tex.*, 236 S.W.3d 390, 401 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (citations omitted). Amigos has not made such a showing here.

The crux of Amigos's complaint is that Guzman's counsel's comments were designed to sway the jury to render a verdict driven by emotions rather than the evidence. As Guzman points out, however, some of the statements Amigos complains of were in response to Amigos's counsel's own arguments. For example, Amigos cites Guzman's counsel's referring to one of Guzman's lawyers as unpaid and emphasizing that Guzman is not represented by a big firm. Amigos had already intimated that it was Guzman with the money and powerful lawyers, arguing: "And, you know, when a 10,000-dollar expert witness and three law firms get together to sue us, they can make our people look -- well, pretty plain spoken, pretty ordinary." Amigos spent considerable time on the us-versus-them dialogue, contending that in Guzman's experts "made up" world there are "all these 300-dollar an hour safety guys strutting around." Amigos's counsel contrasted that world with the real world of Amigos's operations employing uneducated, hard-

working laborers.  Amigos lambasted Guzman's expert's "fantasy world of prying money out of corporations."

Amigos also complains here about Guzman's counsel's comments about how hard it was to get justice for Guzman, and Amigos's allegedly poor treatment of Guzman throughout the process of seeking compensation for his back injury. Relatedly, Amigos points to Guzman's counsel's argument that Guzman just wanted help for his back, but instead Amigos "called him a liar, a cheat, and a fraud, . . . . [and] a criminal."  Amigo's theory of the case, however, was that Guzman was not injured, and was lying.  Amigos's counsel said as much explicitly in its closing argument:

> [Guzman] is a proven liar. He is a perjurer. He has lied under oath repeatedly. That is a crime in the state of Texas. He committed perjury over and over and over by lying in this case under oath whenever it suited him and in his opinion, helped him get millions of dollars. He came into this courtroom and changed his story completely to help him get rich. He had literally a million reasons to lie, and he did lie over and over and over. In earning your trust, can we believe one single word that came out of his mouth? Does his story make sense? Let's think about that. Let's set aside the perjury and the lying just for a moment and try to be objective about his story.

In context of the entire record, we conclude that many of the statements Amigos complains of were invited or provoked by Amigos own statements and theory of the case.  To the extent that any of the statements were improper, nothing Amigos cites individually or in the aggregate is so egregious as to be incurable.

We overrule Amigos's third issue.

# CONCLUSION

We affirm the trial court's judgment.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Brown and Lloyd.