**Rosa CORREA, et al., Appellant,**

v.

**GENERAL MOTORS CORPORATION, et al., Appellee.**

**No. 13–95–307–CV.**

Court of Appeals of Texas, Corpus Christi.

June 26, 1997.

John L. Barnes, Houston, Gilberto Hinojosa, Magallanes, Sokat & Hinojosa, R.W. Armstrong, R.W. Armstrong & Associates, Brownsville, for Appellant.

W. Richard Davis, P. Michael Jung, Strasburger & Price, Kyle H. Dreyer, Dallas, Eduardo R. Rodriguez, Rodriguez, Colvin & Chaney, Brownsville, for Appellee.

Before SEERDEN, C.J., and DORSEY and CHAVEZ, JJ.

## OPINION

DORSEY, Justice.

This is a wrongful death case based in product liability and negligence, in which Rosa Correa and Bernardino Kay sued General Motors Corporation and Knapp Chevrolet for the wrongful death of their sons, Arturo Kay and Belito Correa. The two men died as a result of a one-vehicle accident in which the 1982 Chevrolet S/10 pickup truck Correa was driving left the roadway, overturned, and burned. Witnesses at the scene of the accident testified that both Kay and Correa were conscious and coherent after the accident, but they burned to death when they could not be extricated from the vehicle.

The plaintiffs alleged the fuel system of the S/10 pickup truck, specifically the fuel pump and the fuel lines, were negligently designed and constructed, allowing gasoline to feed the fire in the truck's engine compartment. General Motors denied these allegations and asserted the defense of contributory negligence, arguing the two men were intoxicated and caused the wreck by their intoxication. The jury returned a verdict favoring General Motors on all liability and damage issues, and this appeal ensued. We affirm.

## Background

On the evening of March 17, 1990, Kay and Correa drove eastbound on Texas Highway 159 near La Grange, Texas. The truck left the roadway as it began to negotiate a gradual left curve. The plaintiffs' expert witness estimated the speed of the truck when it left the roadway at fifty-five to sixty miles per hour, and the defense expert estimated their speed at seventy to seventy-five miles per hour. The truck traveled approximately 390 feet along the side of the roadway, and Correa apparently attempted to steer the truck back onto the road, but was unsuccessful. The truck hit a concrete "wing wall" of a culvert crossing the highway, and became airborne. The truck hit the ground some forty-six to forty-eight feet away, flipped upside down, and slid on its roof approximately seventy more feet. The roof of the passenger compartment crushed, trapping Correa and Kay inside the cab of the truck.

Nobody witnessed the accident as it happened, but travelers on Highway 159 came upon the scene shortly thereafter, and saw a fire burning in the engine compartment of the overturned truck. The witnesses testified the fire appeared to be very contained, and only the engine compartment was involved in the fire. The witnesses could hear Correa and Kay calling for help, and spoke with the men, telling them help was coming. One witness testified she had a conversation with the men, who were coherent and alert, and that they expressed a fear of burning to death. Unable to extinguish the fire, the witnesses were forced to drive further up the road to seek help, but when they returned the fire had spread to the passenger com-

partment of the truck and Correa and Kay had died.

The plaintiffs sued General Motors and Knapp Chevrolet alleging that the design of the truck's fuel system caused gasoline to spill in the wreck, and allowed gasoline from the truck's gas tank to feed the fire. The plaintiffs' theory was the impact caused the truck's frame to collapse and hit the alternator, displacing it from its normal place on the engine. The alternator then struck the distributor, which in turn hit the truck's fuel pump, causing the pump to break and spill gasoline into the engine compartment. The plaintiffs also argued the rubber fuel lines in the engine compartment were pulled or sheared from the metal fuel lines extending to the gas tank, and the absence of a one-way "check valve" in the fuel lines allowed gasoline to drain from the overturned truck's gas tank into the engine compartment, feeding the fire and causing Correa and Kay to burn to death. Had the fuel pump not been placed where it was, had it not been intentionally designed to break in half in certain instances, and had there been a check valve in place, the plaintiffs argued Correa and Kay would have survived the accident.

The defense vigorously challenged the plaintiffs' theory of how the fire started and was fed, arguing instead the fire was caused by engine oil and only fed by gasoline after the fuel lines in the engine compartment were burned through by the fire. Several expert witnesses testified the design of the engine was not defective. The defense also presented evidence Correa and Kay had been drinking beer on the night of the accident, arguing they caused the wreck by their intoxication.

## Arguments on Appeal

In their first point of error, appellants argue the trial court erred in admitting testimony that Correa and Kay had been drinking beer on the day of the accident, because such evidence amounted to a mere surmise or suspicion of alcohol consumption, and was more prejudicial than probative. Appellees argue appellants failed to preserve any error on this point, and even if error was preserved, the trial court was within its discre-

tion in admitting the evidence, and any error was not reversibly harmful.

■ In reviewing a claim of trial court error, we first determine whether the claimed error was preserved for our review, then, whether the trial court committed error, and finally, whether the error was harmful. *Sims v. Brackett,* 885 S.W.2d 450, 453 (Tex.App.—Corpus Christi 1994, writ denied). Appellees argue that appellants failed to preserve error because their objection to the testimony was premature, and because they failed to object when similar testimony was offered by later witnesses. At trial, appellees presented the testimony of Jose Martinez, an acquaintance of Correa, who testified Correa and Kay came to his house shortly before the accident, and that Correa was carrying a beer bottle when they arrived, although the bottle was empty and Martinez never saw either man drink anything. Martinez testified the two men asked him if he had any beer, and when he said he did not, they left with the stated intention of going to the store to buy some. Martinez gave them some money to buy beer with, thinking they would return and drink with him, but the two men never returned.

Prior to Martinez's testimony, appellants objected to the proposed testimony, but their objection was overruled. Mr. Martinez's videotaped deposition testimony was then played for the jury. Appellants did not make any further objections to the testimony either during or after the playing of the videotape, nor did they ask that the testimony be stricken.

After Martinez's testimony, appellees called the Texas state trooper who investigated the accident. Trooper Gregory Trojacek testified alcohol played a part in the accident, based on the presence of a cooler, a beer carton, and beer cans strewn on the ground along the path the truck took as it left the highway and overturned. Trooper Trojacek testified he determined these items came from the truck. The only objection to Trooper Trojacek's testimony was that he was not qualified as an expert to render an opinion on the causes of the accident, but the objection was overruled. Appellants made no objection to the speculative or prejudicial nature of Trooper Trojacek's testimony regarding alcohol being a factor in the accident.

Appellees argue that the objection prior to Martinez's testimony did not preserve error because, in general, premature objections preserve nothing for review. *Texas Commerce Bank Reagan v. Lebco Constructors, Inc.,* 865 S.W.2d 68, 78 (Tex.App.—Corpus Christi 1993, writ denied); *Farm Svcs., Inc. v. Gonzales,* 756 S.W.2d 747, 750 (Tex.App.—Corpus Christi 1988, writ denied); *see Trailways, Inc. v. Clark,* 794 S.W.2d 479, 488 (Tex.App.—Corpus Christi 1990, writ denied). Appellees also argue appellants waived any error by failing to object to Trooper Trojacek's testimony. *Atkinson Gas Co. v. Albrecht,* 878 S.W.2d 236, 242–43 (Tex.App.—Corpus Christi 1994, writ denied); *Celotex Corp. v. Tate,* 797 S.W.2d 197, 201 (Tex.App.—Corpus Christi 1990, no writ); *Trailways, Inc.,* 794 S.W.2d at 488. We agree with appellees' second argument.

■ This Court has held that a preliminary objection to an entire block of anticipated testimony is no substitute for specific objections to allegedly inappropriate matters as they are elicited. *Farm Svcs., Inc.,* 756 S.W.2d at 750. Furthermore, error in the admission of testimony is deemed harmless if the objecting party subsequently permits the same or similar evidence to be introduced without objection. *Richardson v. Green,* 677 S.W.2d 497, 501 (Tex.1984). However, we have also recognized the seemingly contradictory rule that when a party makes a proper objection to the introduction of certain testimony by a witness and is overruled, he is entitled to assume the judge will make the same ruling as to other offers of similar evidence, and he is not required to repeat the objection. *Atkinson Gas Co.,* 878 S.W.2d at 242–43 (citations omitted). Consequently, we have held the determination of whether a prior objection is sufficient to cover a subsequent offer of similar evidence depends upon a case-by-case analysis, based on such considerations as the proximity of the objection to the subsequent testimony, which party has solicited the subsequent testimony, the nature and similarity of the subsequent testimony as compared to the prior testimony and objection, whether the subsequent testimony

has been elicited from the same witness, whether a running objection was requested or granted, and any other circumstances which might suggest why the objection should not have to be reurged. *Id.*

■ In the present case, the trial court specifically told appellants any objections to Martinez's testimony would be overruled, stating "You're not going to object to that testimony, are you? If you are, it is coming in. I'll tell you that right now." Appellants could reasonably believe any further objections to Martinez's testimony would be fruitless. We hold appellants did not waive error by failing to re-urge their objections during Martinez's videotaped testimony, or by failing to request the testimony be stricken.

■ However, when Trooper Trojacek subsequently took the stand and testified that beer cans and containers came from Correa's truck, and alcohol played a part in the accident, appellants waived error by failing to object to the similar testimony. This was testimony by a new witness, and was more damning than Martinez's testimony, which was only that he saw Correa holding an empty beer bottle before the accident and that Correa and Kay said they were going to buy more beer, but that he never saw either man take a drink and did not observe evidence of intoxication when he spoke to them. We hold appellants waived error by allowing Trooper Trojacek to testify, without objection, that alcohol played a part in the accident. *Richardson,* 677 S.W.2d at 501. Appellants' first point of error is overruled.

In their second point of error, appellants complain the trial court erred by rendering a judgment in favor of appellees because the jury findings were against the great weight and preponderance of the evidence. Specifically, appellants complain of the jury's determination that there was no design defect in the S/10 pickup truck and that General Motors did not act negligently.

■ A party who bears the burden of proof may challenge the factual sufficiency of the evidence to support a jury's adverse finding by arguing that the finding is "against the great weight and preponderance of the evidence." *Croucher v. Croucher,* 660

S.W.2d 55, 58 (Tex.1983); *Hickey v. Couchman,* 797 S.W.2d 103, 109–10 (Tex.App.—Corpus Christi 1990, writ denied). If a finding is "against the great weight and preponderance of the evidence" the inquiry is whether the finding is so contrary to the overwhelming weight of all relevant evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Hickey,* 797 S.W.2d at 109–10.

The jury was asked the following question regarding defective design:

Question No. 1:

Was there a design defect in the fuel system of the 1982 Chevrolet S/10 Pickup Truck in question at the time it left the possession of General Motors Corporation that was a producing cause of the injury in question?

A "Design Defect" is a condition of the product that renders it unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use.

"Producing Cause" means an efficient, exciting, or contributing cause that, in a natural sequence, produced the injury in question. There may be more than one producing cause.

Answer "Yes" or "No."

Answer: ___No___

■ We review all the evidence in the record to determine whether the jury's finding was against the great weight and preponderance of the evidence. *Wyatt v. McGregor,* 855 S.W.2d 5, 9 (Tex.App.—Corpus Christi 1993, writ denied); *Reviea v. Marine Drilling Co.,* 800 S.W.2d 252, 254 (Tex.App.—Corpus Christi 1990, writ denied). This Court may not reverse simply because we conclude the evidence preponderates toward an affirmative jury finding. *Herbert v. Herbert,* 754 S.W.2d 141, 144 (Tex.1988); *Reviea,* 800 S.W.2d at 254. We may reverse only if the great weight of the evidence supports an affirmative finding. *Herbert,* 754 S.W.2d at 144.

Several expert and fact witnesses testified for the plaintiffs regarding the design of the S/10 fuel system. The plaintiffs presented the deposition testimony of Yoshihide Oku-

mura, the engineer at Isuzu Motors in Japan who designed the 1.9 liter engine General Motors put in the 1982 S/10 pickup truck. He decided that the mechanical fuel pump should be placed at the front of the cam shaft, high and forward on the engine. Since the fuel pump could be in the "crush zone" of the vehicle in that position, and therefore might be damaged in a collision, Okumura designed the fuel pump in such a way that it would break in half if enough force were applied to it. The upper half of the pump, which contained the gasoline, would separate from the lower half, which contained only lubricating oil, and the upper half would remain sealed so no gasoline leaked into the engine compartment. Okumura testified the location selected for the fuel pump was the correct place for it, both for economic and engineering reasons.

Ronald Elwell, a mechanical engineer for General Motors from 1959 until 1987, testified as a fact witness for the plaintiffs. Elwell worked for the Engineering Analysis organization within General Motors. He testified that the fuel pump, which was located at the front of the overhead cam, high and forward on the engine, was "not where it's supposed to be." He stated "the fuel pump is always located low on the engine, behind the protection of the frame, usually located between the frame rails ..." When asked if he had ever seen a fuel pump located in that position in his experience as an engineer, he responded "[n]ever." Elwell also testified the usual practice was to use a steel line between the fuel pump and carburetor, while the vehicle in question used a rubber hose, which can deteriorate over time due to the high temperatures in that region of the engine. He testified it is not normal to have a fuel pump located in a "crush zone" at the front of a vehicle, which is within the front thirty inches of the vehicle. He has never heard of a fuel pump that was designed to "break away" as a safety feature, in the manner that this fuel pump was designed. Elwell also testified it is unusual on General Motors vehicles for the fuel pump to be mounted right next to the distributor, and Elwell has never seen such a configuration before.

Gilbert Kurop is a former mechanical engineer for General Motors, who testified as an expert witness for the plaintiffs. Except for the vehicle in question, he has never seen a fuel pump mounted in this position. After examining the vehicle and the remains of the engine, Kurop developed an opinion about what happened in the accident. Kurop believes when the pickup truck hit the ground, the right side frame rail collapsed and bent upwards into the alternator. The alternator was pushed into the distributor, which in turn hit the fuel pump and broke the pump. Kurop believes the fuel pump broke off, but not at the end at which it was designed to break off. Kurop has never heard of a fuel pump that was intentionally designed to break away as a safety feature. Kurop also believes the fuel lines from the tank to the pump were either cut or pulled from the metal lines, allowing fuel to leak out of the tank. The "duckbill" check valve in the fuel pump would not prevent the fuel from leaking out of the tank after the lines were severed, because there was no check valve between the tank and the break in the fuel line. If there had been a check valve in the tank, no fuel would have reached the fire from the tank. Evidence on the distributor and pump themselves reinforced Kurop's opinion that they had hit each other, since there were dents and cracks on the components consistent with them hitting each other and evidence they had been twisted out of their normal positions on the engine during the accident. In Kurop's opinion, the fuel system of the pickup truck was defectively designed, because it is dangerous to have a break away fuel pump in an area that is going to be crushed in a collision, and to have the fuel pump unprotected and exposed. It would have been technically feasible to put a check valve on the fuel return line in the tank, and the cost of such a valve would have been reasonable. In Kurop's opinion, the defective design was a producing cause of the deaths of Correa and Kay.

Dwight Bliss, an engineer for General Motors since the 1960s, testified by deposition. Bliss had engineering responsibilities for the purchased components from Isuzu for the 1982 S/10 truck. He was "release engineer" for the 1.9 liter engine in the S/10 truck.

Bliss testified that General Motors decided to use a mechanical fuel pump instead of an electrical one because they were following their experience with other larger trucks in terms of fuel system design. The truck was designed to accommodate two engines, a four cylinder and a V–6. The V–6 already had a mechanical fuel pump designed for it, so the idea was to use the same thing in the four cylinder engine. They also had years of experience with the mechanical fuel pump. Bliss did not think the fuel pump in the S/10 pickup was within the potential crush zone in the event of a front-end collision, although he agreed any portion of the vehicle might be considered a crush zone. Bliss was familiar with the break away feature of the fuel pump, and testified it is used in some situations to handle crash failures, because in some cases it is better for the component to break away than to have it stay attached.

The defense presented the expert testimony of William Cichowski, a retired engineer from General Motors who did automobile testing, created crash test dummies, and is an expert on automobile crashworthiness. For this case, Cichowski looked at the police report, examined the accident vehicle and an exemplar vehicle, and read deposition testimony. Cichowski disagreed with the plaintiffs' theory that the fuel pump was knocked loose, causing the fuel lines to rupture and causing the fire. Cichowski testified that it did not appear the alternator moved from its normal spot during the collision, since all three bolts holding the alternator were in place when he examined the vehicle, and there was no apparent bending or deformation on the upper alternator bracket. In order for the alternator to move up and hit the distributor, one of the bolts would have to be broken or the frame of the alternator or the bracket would have to break, none of which happened. Cichowski disagreed with Kurop's testimony that the alternator hit the distributor and then the distributor hit the fuel pump, saying "it can't happen that way." He also did not believe the fuel lines were ruptured during the accident, since residue of the lines was visible on the metal lines leading from the gas tank, indicating that the fuel lines remained in place during the accident and were only subsequently burned through during the fire. According to Cichowski, the fuel pump was not defective in itself or by reason of its location on the engine. Cichowski did not believe the S/10 vehicle was defective with regard to the fuel system, or that the fuel system was in any way unreasonably dangerous.

Larry Ragan, an automotive engineer for Failure Analysis Associates and a former Ford employee testified as an expert witness. Ragan testified it was not uncommon at Ford to use rubber hoses and metal lines in sending fuel from the tank to the engine, as was the case in the S/10, and the same design was used throughout the industry. The need for flexibility in the fuel line requires the use of rubber hoses. It was also very common to use mechanical fuel pumps. Ragan was familiar with mechanical fuel pumps being placed on the forward part of engines in different vehicles, and showed evidence the S/10 was not the only vehicle with a mechanical fuel pump located on the front of the engine. Ragan testified it is a good idea to have the fuel pump designed with a break away feature. After examining the accident vehicle, he did not believe the alternator knocked the distributor into the fuel pump. The distributor, although damaged in the fire, showed no bending, no fracture damage, and no impact damage at all. The distributor is still located in its original position on the engine. Since the distributor didn't move, it could not have contacted the fuel pump. Ragan also believed the remains of the melted fuel pump indicated that the pump was intact during the fire, and melted away as the fire progressed. The remnants of the rubber fuel hoses under the clamps holding them on to the metal fuel lines indicated the rubber hoses were not cut or pulled off, but rather burned away. Ragan did not believe that gasoline was the initiator for this fire, although it did contribute to the fire at a later point after the hoses burned through. Ragan testified that, in his opinion, the vehicle was not defective by reason of its fuel system. It was "very much state of the art and typical of other vehicles produced in that time frame." On cross examination, Ragan admitted he could not exclude the possibility

the alternator and distributor came into contact with each other during the accident.

Juan Herrera, Ph.D, a metallurgical engineer, testified for the defense. Dr. Herrera inspected the accident truck, and read accident reports and witness statements. He testified the plaintiff's theory about the alternator knocking the distributor into the fuel pump is not correct. There was no evidence of this sequence of events. The bolts holding the alternator were still in place, and would not have allowed it to hit the distributor. Even if it had broken loose, it would have hit the distributor at a different point than the plaintiffs argue happened. Also, the distributor did not come in contact with the fuel pump. Evaluating the strength of each one of the components, the distributor would have broken before it could have been moved enough to hit the fuel pump. Even if it did hit the fuel pump, the distributor was not strong enough to break it. The break away feature of the pump only works when the pump is hit from the front, not from below, like the distributor would have done. Examination of the components in the vehicle shows they were oxidized by fire, not broken. Although the force of the impact might have caused the components to move out of place and then snap back into place, they could not have moved enough to cause the damage the plaintiffs were claiming. Based on Dr. Herrera's calculations, the break away feature of the fuel pump had nothing to do with the accident. The fuel lines themselves were not pulled away from the metal fuel lines, because there is still rubber residue left under the clips. Also, there is nothing that would have cut the hoses in their position, since they are free to move if they are hit. Dr. Herrera testified that it is good design practice to put the pump at the top front of the truck's engine.

■ After reviewing the evidence regarding the design of the fuel system in the S/10 pickup truck, we cannot say that the jury's determination that there was no design defect was against the great weight and preponderance of the evidence. The jury was presented evidence by experts on both sides of the issue, and heard conflicting opinions regarding the design of the fuel system. We cannot say the jury was incorrect in believing appellees' experts over appellants' experts. It was the jury's province to resolve the conflict in the evidence regarding a defect in the design of the fuel system, and it is not for this Court to substitute its opinion for that of the jury in such a case. *Cantu v. Butron,* 921 S.W.2d 344, 350 (Tex.App.—Corpus Christi 1996, no writ). Appellants' second point of error is overruled with regard to the question of design defect.

Appellants also argue the jury's determination that General Motors was not negligent was against the great weight and preponderance of the evidence. The jury was asked:

Question No. 2:

Did the negligence, if any, of those named below proximately cause the injuries in question?

"Negligence" means failure to use ordinary care; that is, failing to do that which a person or corporation of ordinary prudence would have done under the same or similar circumstances, or doing that which a person or corporation of ordinary prudence would not have done under the same or similar circumstances.

"Proximate Cause" means that cause which, in a natural and continuous sequence, produces an event, and without which cause such even would not have occurred; and in order to be a proximate cause, the act or omission complained of must be such that a person or corporation using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

Answer "Yes" or "No" for each of the following:

A. General Motors Corporation : No

B. Belito Correa : Yes

The jury also found that Correa alone was at fault in the accident. Appellants challenge the sufficiency of the evidence to support this finding in their third point of error. Because the question is so related to the jury's failure to find General Motors negligent and in-

volves the review of essentially the same evidence, we discuss the two points together.

Appellants presented evidence of negligence on the part of General Motors in the design and production of the S/10 pickup, as follows. Okumura agreed that an important consideration in designing the engine and pump is to try to design it in such a way that minimizes, as much as possible, the risk of a post-collision fuel-fed fire. He testified that General Motors was given prototype engines as Isuzu developed them. Between 1979 and 1981, while Isuzu developed the engine, General Motors had design engineers and release engineers analyzing the engine. General Motors ultimately approved the engine design and authorized its production by Isuzu. General Motors had the final say with regard to the location and configuration of the component parts of the engine, including the fuel pump. During the design process, General Motors proposed that steel lines be used instead of rubber for the fuel lines, but Isuzu recommended staying with rubber, because steel would thwart the function of the break away portion of the fuel pump.

Ronald Elwell testified about a report written in the early 1970s by Ed Ivey, an employee of the Oldsmobile Division of General Motors. The Oldsmobile Division was responsible for evaluating fuel systems for General Motors vehicles. The report, titled "Value Analysis of Auto Fuel–Fed Fire–Related Fatalities" indicated that General Motors could expect a maximum of 500 fatalities per year in accidents with fuel-fed fires where the bodies were burned, and those fatalities cost General Motors between $2.20 and $2.40 per vehicle they produced. General Motors used technology in the fuel system of the Corvette that greatly increased the fuel system integrity and prevented leakage. The report indicated if General Motors implemented new technology on all their cars it would prevent fuel-fed fires, but if that technology cost General Motors more than the $2.20 to $2.40 per vehicle than they were paying already, it was cheaper to pay off the lawsuits that to implement the changes. Elwell suggested while he was working as an engineer at General Motors they use metal-reinforced fuel lines, as are used in aircraft, but this suggestion was not adopted.

Gilbert Kurop testified that in his opinion, the design of the S/10 was done negligently, since the fuel pump wasn't guarded, there were alternative designs available, and the fuel pump was placed in a hostile environment. He also testified the negligent design of the truck was a proximate cause of the fire injuries and the fire deaths of Correa and Kay. Kurop believed there was gross negligence in the design and release of the truck, because there was conscious disregard for the safety of others in that the engine designer knew the fuel pump was in harm's way, the break away design was unsound, and the General Motors engineering staff never tested or evaluated the break away feature. Furthermore, if there had been a check valve on the fuel return line on this vehicle, fuel could not have drained from the tank into the engine compartment, and Correa and Kay would not have burned.

William Cichowski testified for appellees that the "duckbill" check valve in the fuel pump was put there primarily to pressurize the flow of fuel, not to prevent fuel from flowing back from the tank, and the presence of a check valve in the tank itself could cause problems with the tank becoming improperly pressurized. Cichowski testified about the crash tests performed on the S/10 design. After crashing and then inverting a test S/10 truck, only 3.6 grams of fuel leaked out of the vehicle. He testified that it is impossible to prevent all gasoline from leaking in every accident and fire. Cichowski agreed the technology was available to put a check valve on the fuel return line in the S/10 pickup, and he did not know of any other General Motors vehicles that had a fuel pump with a break away feature designed into it. He thinks the break away feature was a good idea to try to control where the pump broke. General Motors did not do any testing on the break away fuel pump, but rather accepted the test data provided by Isuzu. Cichowski agreed if there had been a properly designed and working check valve on the fuel return line, gasoline from the tank could not have fed the fire.

Edward Ivey, the engineer who wrote the report on the cost to General Motors of fuel-fed fires, testified for the appellees regarding that report. Ivey completely repudiates that report now, saying the numbers and calculations were in error and are not valid. Ivey testified that he does not remember who asked him to write the report, why he wrote it or who he gave it to.

Appellants also presented evidence regarding the actions of Correa and Kay when the accident occurred. Jeanine Foster, one of the first witnesses at the scene of the accident, testified she spoke with the men in the truck, and they sounded rational and coherent. She did not detect the odor of alcohol. Judson Matthias, a professor of civil engineering and an expert in accident reconstruction, testified that, after examining the accident site and reviewing the testimony of the witnesses and police at the scene, he concluded the truck was traveling at approximately 55 to 60 miles per hour when it left the roadway. Matthias testified the tracks left by the truck indicated that the driver attempted to steer back on to the road, but the truck skidded sideways rather than returning to the road. He also testified that, although he does not know why the truck left the road, the actions of the driver after leaving the road were consistent with someone who is in control of the vehicle. Matthias admitted on cross-examination there was no evidence that the driver applied the brakes after the truck left the road, and if he had used the brakes he could have slowed the vehicle down.

Appellees presented evidence that Correa and Kay had been consuming alcohol on the night of the accident. Jose Martinez testified he saw Correa carrying an empty beer bottle, and Correa and Kay asked him for beer. Martinez also testified Correa and Kay left his house with the stated intention of going to the store to buy beer. Officer Trojacek testified that he concluded alcohol as well as excessive speed were contributing factors in the accident. He testified beer containers were scattered on the ground along the path of the truck, and he determined these containers came from the truck. Officer Trojacek testified there were no skid marks on the road before the point where the

truck left the road. The tracks in the ground on the side of the road indicated to him that the driver was attempting to steer the truck.

Thomas Richter, a volunteer ambulance attendant who arrived at the crash site, testified by deposition for appellees that it looked to him like the truck had "very excessive speed" and they went off the road when they missed a curve. He could see no skid marks. There were many empty beer cans laying around the bed of the pickup truck, although he can't say what the origin of the cans was. The cans were on the ground from the point the truck apparently flipped, to the point where it came to rest. He thought the cans originated from the truck.

Dr. Ed Martinez, a former professor of engineering and an accident reconstructionist and president of Automotive Research Corporation, testified for appellees that, in his opinion, Correa and Kay drove off the road due to inattention to road conditions. He also found the driver's failure to control the vehicle was a factor in the accident. According to his calculations, the truck was traveling at approximately seventy to seventy-five miles per hour when it left the road, which was in excess of the posted speed limit of fifty-five miles per hour. Had the driver applied his brakes at the appropriate time, he probably would have been able to stop the vehicle.

After reviewing this evidence, we cannot say that the jury's determination that Belito Correa's negligence alone was the proximate cause of his and Kay's death was against the great weight and preponderance of the evidence. Appellees presented evidence indicating Correa and Kay were driving at an excessive rate of speed, that they were not attentive to the road conditions, and that they had been consuming alcohol prior to the accident. They also presented evidence that the design of the S/10 pickup truck's fuel system was not defective and that they and Isuzu tested the truck for fuel leakage before releasing it to the public. The tests included severe impact testing and inversion of the truck, and resulted in minimal fuel loss. General Motors' expert witnesses all agreed that in the present case,

the cause of the engine fire was either motor oil or coolant, and gasoline only fed the fire after the fuel lines burned through, not because of the design of the pump or the fuel system. The jury's determination that Correa alone was responsible for his and Kay's death is not against the great weight and preponderance of the evidence. Appellants' second and third points of error are overruled.

The judgment of the trial court is AFFIRMED.