

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00230-CV

_____

MIRANDA ALLEN, Appellant

V.

ASHLEE INMAN, Appellee

On Appeal from County Court at Law No. 2
Tarrant County, Texas
Trial Court No. 2016-004707-2

Before Sudderth, C.J.; Gabriel and Wallach, JJ.
Memorandum Opinion by Justice Wallach
Dissenting Memorandum Opinion by Justice Gabriel

# MEMORANDUM OPINION

Miranda Allen experienced a sneezing fit while driving, rear-ended another vehicle (which had slowed down for merging traffic), and injured its driver, Ashlee Inman; Inman sued Allen for negligence. Allen did not dispute that she was responsible for the accident; a jury found her negligent and awarded Inman $121,500 in compensatory damages. The trial court denied Allen's motion for new trial. Allen appealed and raises six issues:

(1) whether Inman's attorney made incurable jury arguments during closing arguments, and whether the trial court erred by denying Allen's motion to reopen the evidence to address Inman's attorney's improper arguments;

(2–3) whether the evidence is legally and factually sufficient, respectively, to support the jury's finding regarding the market-value difference of Inman's automobile immediately before and immediately after the accident;

(4–5) whether the evidence is legally and factually sufficient, respectively, to support the jury's finding regarding the reasonable expenses of necessary medical care incurred in the past; and

(6) whether the jury's findings regarding (a) physical pain and mental anguish sustained in the past and (b) physical impairment sustained in the past are in irreconcilable conflict.

We hold that (1) Allen did not preserve her complaint about Inman's arguments and, in any event, Allen cannot show harm; (2–3) the evidence is both legally and factually sufficient to support the jury's finding on the market-value difference of Inman's vehicle immediately before and immediately after the accident; (4–5) the evidence is both legally and factually sufficient to support the jury's finding on the reasonable

expenses of necessary medical care incurred in the past; and (6) the jury's findings on (a) physical pain and mental anguish sustained in the past and (b) physical impairment sustained in the past are not in irreconcilable conflict. We overrule all six issues and affirm the trial court's judgment.

## I. JURY ARGUMENT AND MOTION TO REOPEN

Allen's first issue has two components: first, she complains about Inman's jury arguments, and second, she faults the trial court for not letting her reopen the evidence to address Inman's jury arguments.

### A. BACKGROUND

During trial, Allen called one witness, her retained medical expert—Dr. Craig DuBois—and played his videotaped deposition to the jury.[1] During the deposition, Allen's attorney is the only one to ask Dr. DuBois questions. After Allen's counsel completes his direct examination, the video stops. No cross-examination occurs.[2]

During final arguments, Allen's counsel argued that Inman did not cross-examine Dr. DuBois during his deposition because Inman had no basis to question Dr. DuBois's veracity:

---

[1]Our record does not include the video but does include the court reporter's transcription of the video as it was played to the jury.

[2]Earlier Allen had gotten one of Inman's witnesses to lament that no one had "torn up" Dr. DuBois on cross-examination.

[ALLEN'S ATTORNEY]: I love the criticism about Dr. DuBois of what financial gain has he been established to have in this other than just providing his opinion. And you know what? If he's so bad, so old, so off the mark and so in the bag, so to speak, why not take him on—why not question him? Why not take him on? Why not ask him questions? His testimony is what we call unrebutted. Think about that. Did anybody even challenge with what Dr. DuBois said about reasonableness and necessity? They did not, because there's no real basis to it. Because if you honestly review and state your opinions based upon evidence and facts, there's no way they can—easiest thing to do in the world is to tell the truth. Hardest thing is to tell a lie and keep it and be able to keep it up. So think about that, that his testimony is absolutely unrebutted.

Inman voiced no objection when the argument was made.

Instead, Inman's counsel responded in rebuttal that there were two reasons why no one cross-examined Dr. DuBois during his deposition. The first was that cross-examination was not necessary because Inman had presented Dr. Jeffrey Komenda's and Dr. Benjamin Dagley's trial testimony to rebut Dr. DuBois's testimony. As for the second reason, before Inman's counsel could state it, Allen's counsel objected:

[INMAN'S ATTORNEY]: Ladies and gentlemen, there's two things. I hope that this case is decided by logic and not by an attorney who yelled the loudest or who didn't let the witnesses answer the questions or who kept interrupting the witnesses. It's okay to be aggressive, but this case should be decided on logic and what the witnesses said. [Allen's attorney] said that we didn't controvert Dr. DuBois'[s] testimony. There'[s] two reasons for that. One, it really wasn't necessary, because Dr. Komenda and Dr. Dagley already testified about the procedures and the cost. And the second reason why he wasn't questioned was the attorney that had this case before—

[ALLEN'S ATTORNEY]: Objection, your Honor—

4

[INMAN'S ATTORNEY]: I got involved—

[ALLEN'S ATTORNEY]: —he's going outside—

THE COURT: Hold on a minute. Hold on a minute.

[ALLEN'S ATTORNEY]: He's trying to give an explanation as to why—

THE COURT: You know what? You opened the door when you—you opened the door, sir, so if you continue—your time is still ticking. You opened the door. Your time is ticking.

[ALLEN'S ATTORNEY]: Can we reopen, your Honor—

THE COURT: No.

Inman's counsel then launched into the second reason why no one had cross-examined Dr. DuBois during his deposition—Inman had no attorney there:

> [INMAN'S ATTORNEY]: Ladies and gentlemen—and I want everyone to look at me when I say this. The reason why an attorney did not show up to Austin to depose Dr. DuBois was because the attorney that had the case—his name is Mr. [X[3]], and his father passed away the day before. Mr. [X] no longer works with our firm. He's gone on to another firm, but that's why. He says that it was controverted. Well, a lot of this stuff that he's done in this case is done to deliberately shift you and get you away from using . . . logic. He opened the door, and I wanted to provide an explanation for that.

Allen voiced no objection when the argument was made, made no request for the jury to disregard, and made no motion for mistrial at that point. Once the jury left the courtroom, Allen's counsel resumed the debate:

---

[3]Rather than identify this attorney, we refer to him simply as Mr. X.

5

THE COURT: We have taken a break for their deliberations, and [Allen's counsel] has a motion you'd like to make at this time.

[ALLEN'S ATTORNEY]: Yes, your Honor. The Court allowed [Inman's attorney] to say that—for which . . . there was no evidence, that the reason that they did not cross[-]examine Dr. DuBois, one of those was that the attorney who was handling the case, his father died the day before. I'd like to reopen solely to put on evidence of the proceedings of Dr. DuBois'[s] deposition; that [an attorney for Inman] was actually called when they failed to show up, and he said they decided not to be there. Go ahead without him. So there was absolutely no sort of statement that anyone had died. It provides a misconception to the jury which is simply improper in that regard, your Honor.

[INMAN'S ATTORNEY]: Your Honor, my response is simply this. During [Allen's attorney's] closing argument, he made numerous statements that we didn't controvert Dr. DuBois'[s] testimony. I believe that he opened the door. Had he not mentioned that and just made arguments based on what Dr. DuBois testified [to] during his sworn deposition, then I think we would have been okay. [Allen's counsel], rather than make those arguments, decided to sua sponte, open the door, and get into any extraneous information that we could—that allowed me to explain the reason why Dr. Dubois—

THE COURT: Hold on a moment.

[INMAN'S ATTORNEY]: —which then opened the door and allowed me to offer an explanation to the jury as to why that occurred. Had [Allen's attorney] kept that door shut, then my mouth would have been kept shut as to that specific issue. Nothing further.

[ALLEN'S ATTORNEY]: Number one, there's no evidence of what he said to the jury, and there was timely objection to it. Number two, I have a perfect right to make an issue that a witness was not cross[-]examined in regard to the testimony. [Inman's attorney] knew it was an issue. If he thought that he needed to get that done, he could have put on [the attorney we spoke to and who told us to go ahead] or whoever to put up some evidence as to why they didn't appear. That would be incumbent upon them. I took them for their word, what we put on the record, as to

why they weren't showing up. They just elected to not show up since [the attorney we spoke to] was doing the deposition in the case anyway.

THE COURT: I believe you opened the door. There's absolutely no evidence in front of this jury, as well, why there was no cross[-]examination then of Dr. DuBois. And during closing arguments, it went a little bit further to make the inference—and you can make reasonable inferences from the evidence. But there was no evidence that Dr. DuBois was not cross[-]examined, because clearly, he was a credible witness and clearly, there were no issues that [Inman] had with his testimony. And so I think it went a little bit further. There was no evidence either way, so once it was brought up before the jury, there was no evidence about why there was no cross[-]examination. If that line would not have been crossed, I would not have let [Inman's counsel], then, go ahead and go into the reasoning why there was no one there, and that's why the Court made the ruling. There was no evidence either way, and I think there was no error, because there was no evidence either way. Both of you argued things that there was no evidence about, but you opened the door in the—that was the Court's belief.

[ALLEN'S ATTORNEY]: Just [Allen's] position, your Honor, respectfully, that [Inman's attorney] is testifying. My comment was that there was no cross[-]examination and that there was no good reason or opinion about why there would be no cross[-]examination. But as far as starting to testify about people dying and didn't show up because of that—I mean, I'm not going to take a deposition if somebody's father dies, tough luck, but that's the impression that he's trying to give. Well, these guys, you know, shut this down. That's the bottom line, your Honor. So I would like to open up to put in the proceedings of what actually occurred at the deposition.

THE COURT: I'm going to deny that request. I've already, also, told the jury that nothing that the lawyers say is evidence, and during closing arguments, they will make reasonable inferences from the evidence in the case, but nothing they say is evidence.

THE BAILIFF: Jury is seated, your Honor.

The record shows that the attorney representing Allen at Dr. DuBois's deposition was the same one who argued on Allen's behalf at trial. Allen's attorney thus knew firsthand that Inman had no counsel present for Dr. DuBois's deposition.

## B. JURY ARGUMENT

### 1. The Law

Rule 269(e) of the Texas Rules of Civil Procedure governs jury arguments. Tex. R. Civ. P. 269(e). Attorneys must confine their arguments strictly to the evidence and to opposing counsel's arguments. *Id.*

Controlling counsel's conduct during jury argument rests in the trial court's sound discretion. *Richmond Condos. v. Skipworth Commercial Plumbing, Inc.*, 245 S.W.3d 646, 667 (Tex. App.—Fort Worth 2008, pet. denied) (op. on reh'g); *Wells v. HCA Health Servs. of Tex., Inc.*, 806 S.W.2d 850, 854 (Tex. App.—Fort Worth 1990, writ denied); *see* Tex. R. Civ. P. 269. The test for improper jury argument is whether the argument could have persuaded a juror of ordinary intelligence to agree to a verdict contrary to that which the juror would have agreed to but for the argument. *See Richmond Condos.*, 245 S.W.3d at 667; *Welch v. McLean*, 191 S.W.3d 147, 161 (Tex. App.—Fort Worth 2005, no pet.) (op. on reh'g), *overruled on other grounds by Phillips v. Bramlett*, 288 S.W.3d 876, 880–81 (Tex. 2009). To obtain reversal of a judgment based on improper jury argument, a complaining party must prove

(1) an error

8

- that was not invited or provoked;

- that was preserved at trial by a proper objection, motion to instruct, or motion for mistrial; and

- that was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the trial court; and

(2) that the argument by its nature, extent, and degree constituted reversibly harmful error.

*Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839–40 (Tex. 1979) (citing 3 McDonald, Tex. Civ. Prac. § 13:17.2 (1970)); *Amigos Meat Distribs., L.P. v. Guzman*, 526 S.W.3d 511, 525 (Tex. App.—Houston [1st Dist.] 2017, pet. denied); *Richmond Condos.*, 245 S.W.3d at 668; *Welch*, 191 S.W.3d at 161.

"[A]n argument that is provoked or invited by an opponent's argument is not objectionable when directed to the subject matter introduced by the opponent, even though it might have been improper without such provocation." 4 Roy W. McDonald & Elaine A. Grafton Carlson, Tex. Civ. Prac. § 23:5 (2d. ed. 2001). The invited argument rule permits comment outside the record in response to an argument by opposing counsel that went outside the record. *See Curry v. State*, 861 S.W.2d 479, 485 (Tex. App.—Fort Worth 1993, pet. ref'd).

To obtain a reversal based on an allegedly improper argument, the complaining party must show that (a) the probability that the improper argument caused harm is greater than (b) the probability that the verdict was grounded on the proper

9

proceedings and evidence. *Standard Fire Ins. Co.*, 584 S.W.2d at 840; *Amigos Meat Distribs., L.P.*, 526 S.W.3d at 525; *Richmond Condos.*, 245 S.W.3d at 668.

## 2. Discussion

We hold that Allen cannot meet either the first or the second requirement.

### a. Premature objection

When Allen first objected, Inman's counsel had not yet said anything objectionable. "[P]remature objections preserve nothing for review." *Holmes v. Concord Homes, Ltd.*, 115 S.W.3d 310, 316 (Tex. App.—Texarkana 2003, no pet.); *see Correa v. Gen. Motors Corp.*, 948 S.W.2d 515, 518 (Tex. App.—Corpus Christi–Edinburg 1997, no writ); *see also Watts v. Adviento*, No. 02-17-00424-CV, 2019 WL 1388534, at *7 (Tex. App.—Fort Worth Mar. 28, 2019, no pet.) (per curiam) (mem. op.) (citing *Holmes*, 115 S.W.3d at 316, and *Correa*, 948 S.W.2d at 518).

### b. No objection

When Inman's counsel proceeded to argue outside the record, Allen did not object. Objections must be timely. Tex. R. App. P. 33.1(a)(1); *see Cantu v. Cantu*, 556 S.W.3d 420, 435 (Tex. App.—Houston [14th Dist.] 2018, no pet.). "Appellate complaints of improper jury argument must ordinarily be preserved by timely objection . . . ." *Phillips*, 288 S.W.3d at 883.

### c. Late objection

After the jury left the courtroom, Allen again complained about Inman's counsel's argument. By this point, any objection was too late. *See* Tex. R. App. P. 33.1(a)(1); *Moon v. Spring Creek Apts.*, 11 S.W.3d 427, 432 (Tex. App.—Texarkana 2000, no pet.).

### d. Wrong relief

Not only was Allen's objection late, but the relief that she sought was not an instruction to disregard. *See Phillips*, 288 S.W.3d at 883. Assuming error, any error was curable by an instruction to disregard, a prompt withdrawal of the statement, or a reprimand by the judge. *See PopCap Games, Inc. v. MumboJumbo, LLC*, 350 S.W.3d 699, 721 (Tex. App.—Dallas 2011, pet. denied). We rely on our harm analysis below to support our conclusion that any error was curable.

### e. No harm

Allen also cannot meet the second requirement—harm. Allen argues that Inman depicted Allen's counsel as someone who knew that Mr. X's father had died but proceeded with Dr. DuBois's deposition anyway. We disagree. Inman's counsel did not assert that Allen's counsel took advantage of Mr. X's absence to depose Dr. DuBois.

Furthermore, Inman's counsel's first explanation—no one cross-examined Dr. DuBois because Inman rebutted his testimony with that of two other doctors at

11

trial—told the jury that Inman was not relying on cross-examination to rebut Dr. DuBois's testimony. Inman's argument diverted the jury away from any contention that Allen had gained an unfair advantage.

Finally, the record shows that despite having heard Allen's counsel's improper argument, the jury gave Dr. DuBois's testimony considerable weight. Dr. DuBois consistently questioned Inman's doctors' choices, asserted that they had performed unnecessary procedures, maintained that they had improperly charged some fees, and accused them of charging excessive fees for services that had been performed. By Allen's own calculations, Inman was seeking $125,797.09 in reasonable expenses and necessary medical care incurred in the past. The jury awarded less than half that amount—$56,000.

We hold that Allen cannot meet the second requirement—harm. *See id.*

### f. One other wrinkle

Allen further complains that Inman's assertion that Mr. X's father had died the day before the deposition turned out to be false. Mr. X's father died three days after the deposition, not one day before.

At the hearing on Allen's motion for new trial, Mr. X stated, "I don't recall specifically what the reasoning would have been [for missing the deposition], if it was a scheduling conflict or something I had going on with my father. I honestly can't say." The day before the deposition (October 26), Mr. X had texted the office to see if

12

someone could cover Dr. DuBois's deposition for him, but his text did not state why he was not available. Three days after Dr. DuBois's deposition (October 30), Mr. X texted to say that his father had died, that he would not be back in the office, and that he wanted his pending depositions cancelled or covered.

Another attorney in Inman's counsel's office acknowledged that Allen's counsel's office had called the day of Dr. DuBois's deposition (October 27) and asked why no one representing Inman was there, that he told opposing counsel to go ahead with the deposition, and that he did not mention any emergency that prevented any of Inman's attorneys from being there. Thereafter, Inman's attorneys made no effort to depose Dr. DuBois or to strike his deposition testimony. This attorney explained that although Mr. X's October 26 text asking someone to cover Dr. DuBois's deposition the next day did not mention his father's illness, his father's illness was not a secret:

> I mean, his dad was really sick. I think it was his wife that told me his dad was—like, that it was kind of the end. And I think that's—he didn't tell me. She told me, and then that's what he—he said—at some point, he sent that text to me, ["W]ho was going to cover the depo?["]

This attorney testified that he did not want the fact that no attorneys appeared at Dr. DuBois's deposition to come into evidence. And Allen's attorney acknowledged that Inman's attorneys expressed this concern during pretrial.

The attorney for Inman who had actually made the argument to the jury that Mr. X had missed Dr. DuBois's deposition because his father had died the day before did not dispute that he had seen Mr. X's October 26 and October 30 texts during

13

pretrial and that those texts showed that Mr. X's father had passed away three days after the deposition; he did not dispute that his jury argument was thus false, but he asserted that he had just glanced at the texts and that the jury arguments had occurred a couple of days later. He added that Mr. X was missing a lot of work during that time either because his father was ill or because Mr. X was taking his son to visit various colleges. The attorney denied intentionally misleading the jury:

> I remember it being right around the time that Dr. DuBois was—of DuBois'[s] deposition, and I think when I found out that the deposition had been missed, it was right around the time that [Mr. X's] father had passed away. So I just put two and two together. He missed the deposition because his father passed away.[4]

Allen argues that Inman made an unfounded, emotional play on the jurors' sympathies. We remain unpersuaded.

Inman's counsel's error regarding the date of the death of Mr. X's father does not change our analysis.[5] Allen failed to preserve her complaint, and in any event,

---

[4]During the pretrial conference, Inman's counsel made the same assertion: "Your Honor, I'm making my first appearance on this case, but the lawyer that had the case before, his name is Mr. [X]. Mr. [X's] father passed away I think the day before that deposition of their expert was scheduled, and so he did not attend the deposition." Dr. DuBois's deposition came up during pretrial because Inman's counsel wanted to use portions of it in Inman's case-in-chief, but Allen's counsel objected.

[5]Under an abuse-of-discretion standard, we view the evidence in the light most favorable to the trial court's ruling. *Imkie v. Methodist Hosp.*, 326 S.W.3d 339, 344 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (op. on reh'g). We conclude that the trial court implicitly found that Inman's counsel had an inexact factual understanding and thus that his error was inadvertent—not deliberate.

14

Allen could not show harm. The jury could have perceived the reference to Mr. X's father's death as an attempt to save face—to deflect criticism away from Inman's attorneys for not showing up for the deposition. Having to speculate on how a jury might have interpreted an ambiguous argument weighs against a reversal. *See Welch*, 191 S.W.3d at 162. Contextually, Inman's attorneys were concerned that their failure to appear at Dr. Dubois's deposition would reflect badly on them—to the jury and perhaps to Inman herself. The only reason that Inman's counsel broached the subject at all was because he thought—as had the trial judge—that Allen's counsel had opened the door and invited a response.

After evaluating the record before us, we cannot say that the probability that the alleged improper argument caused harm is greater than the probability that the verdict was grounded on the proper proceedings and evidence. *See Standard Fire Ins. Co.*, 584 S.W.2d at 840. Nor can we say that that argument could have persuaded a juror of ordinary intelligence to agree to a verdict contrary to that which the juror would have agreed to but for the argument. *See Williams v. Lavender*, 797 S.W.2d 410, 414 (Tex. App.—Fort Worth 1990, writ denied).

## C. REOPENING EVIDENCE

### 1. The Law

We review the denial of a motion to reopen the evidence under an abuse of discretion standard. *Rollins v. Tex. College*, 515 S.W.3d 364, 371 (Tex. App.—Tyler

2016, pet. denied); *Poag v. Flories*, 317 S.W.3d 820, 827 (Tex. App.—Fort Worth 2010, pet. denied). Texas Rule of Civil Procedure 270 allows a trial court to permit additional evidence when it clearly appears necessary to the administration of justice. Tex. R. Civ. P. 270. However, the rule does not require a court to permit additional evidence. *Poag*, 317 S.W.3d at 828. In determining whether to permit additional evidence, a court should consider whether (1) the moving party showed due diligence in obtaining the evidence; (2) the proffered evidence is decisive; (3) reception of such evidence will cause undue delay; and (4) granting the motion will cause injustice. *Id.*

## 2. Discussion

To determine reasonable expenses and necessary medical care incurred in the past, the jury had Inman's witnesses (Dr. Komenda and Dr. Dagley, who had criticized Dr. DuBois) and Allen's witness (Dr. DuBois, who had criticized both Inman's medical treatment and billing). Why Mr. X was not present for Dr. DuBois's deposition was tangential, not decisive. Justice did not require reopening the testimony. We hold that the trial court did not abuse its discretion by denying Allen's motion to reopen. *See id.*

## D. RULING

We overrule Allen's first issue.

16

## II. LEGAL- AND FACTUAL-INSUFFICIENCY CHALLENGES

Allen's second through fifth issues raise legal- and factual-insufficiency challenges. Before addressing the merits of these issues, we present the standards of review.

### A. LEGAL INSUFFICIENCY STANDARD OF REVIEW

When challenging the legal sufficiency of an adverse finding on an issue for which the appellant did not have the burden of proof, the appellant must demonstrate on appeal that no evidence supports the adverse finding. *See Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011). Evidence is legally sufficient if it would enable fair-minded and reasonable people to reach the verdict under review. *Id.* We credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *Id.*

### B. FACTUAL INSUFFICIENCY STANDARD OF REVIEW

When a party without the burden of proof challenges the factual sufficiency of the evidence to support an adverse jury finding, that party must show there is insufficient evidence to support the adverse finding. *Holden v. Holden*, 456 S.W.3d 642, 654–55 (Tex. App.—Tyler 2015, no pet.) (citing *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983)). This Court considers and weighs all the evidence and will set aside the verdict only if the evidence is so weak that the finding is clearly wrong and

17

manifestly unjust. *Id.* at 655 (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam)).

## C. CREDIBILITY AND WEIGHT

The factfinder alone judges the witnesses' credibility and the weight to assign to their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *Holden*, 456 S.W.3d at 655. The factfinder is free to believe one witness and disbelieve another. *Holden*, 456 S.W.3d at 655. Resolving conflicts in the evidence falls within the jurors' province. *Id.* We cannot substitute our judgment for the jury's. *Golden Eagle Archery, Inc.*, 116 S.W.3d at 761.

## D. THE MARKET-VALUE DIFFERENCE IN INMAN'S VEHICLE IMMEDIATELY BEFORE AND IMMEDIATELY AFTER THE ACCIDENT

In her second and third issues, Allen argues that the jury question asked for the difference in market value of Inman's vehicle "immediately before and immediately after the occurrence in question." Allen contends that there was no evidence or factually insufficient evidence of what Inman's car's market value was "immediately after the occurrence in question."

Auto appraiser Justin Petty prepared a diminution-of-value report for Inman's vehicle. The report reflects "the difference between a vehicle's value that has an accident history and one that doesn't have an accident history." He testified that Inman's vehicle's pre-loss value was $32,396 and that repairing her car had cost about

18

$16,841. After the repairs, he estimated the car's value at about $25,000. He estimated that the diminution of value in Inman's vehicle was $8,181.

In response to the jury question asking what the difference in Inman's car's market value was "immediately before and immediately after the occurrence in question," the jurors answered, "$8,000." Allen contends that the $8,000 amount represents the car's reduced value after repairs, not its reduced market value "immediately after the occurrence in question." Allen maintains that there was no evidence or factually insufficient evidence of what that might have been. We disagree.

Evidence showed that the car's value, after the repairs had been completed, had diminished about $8,000. A reasonable inference is that the diminution of the car's market value before the repairs would have been greatly in excess of $8,000. Even before the repairs, the jury could reasonably conclude that the market value had dropped—at a minimum—by $8,000. So long as the jury's award falls within the range of damages supported by the evidence, we cannot disregard its award on the basis that its reasoning in arriving at its figure is unclear. *Powell Elec. Sys., Inc. v. Hewlett Packard Co.*, 356 S.W.3d 113, 127 (Tex. App.—Houston [1st Dist.] 2011, no pet.). Because there was evidence that after the accident the vehicle's value had diminished by at least $8,000 even with the repairs, we hold that there was both legally and factually sufficient evidence to support the jury's finding. *See Exxon Corp.*, 348 S.W.3d at 215; *Holden*, 456 S.W.3d at 655.

We overrule Allen's second and third issues.

## E. THE REASONABLE AND NECESSARY EXPENSES FOR PAST MEDICAL CARE

Allen acknowledges that Inman sought reasonable and necessary past medical expenses in the amount of $125,797.09, but she maintains that $79,226.50 of that amount (the portion billed by Cedar Hill Interventional Pain Center, where some of the medical procedures were performed) should not have counted as evidence because the Pain Center was not a licensed surgical facility. Without the $79,226.50 from the Pain Center, Allen maintains that only $46,570.59 of the $125,797.09 total is thus supported by the evidence. Because the jury found $56,000 in damages, Allen contends that the jury necessarily had to rely on the Pain Center billing for the $9,429.41 in excess of $46,570.59. In her fourth and fifth issues, Allen thus concludes that the evidence is legally and factually insufficient to support the award. We again disagree.

### 1. The Evidence

Dr. Dagley treated Inman at the Cedar Hill Pain & Rehab clinic. Dr. Dagley, along with other doctors, owned the Rehab clinic. When performing certain procedures on Inman, however, Dr. Dagley and one of his partners, Dr. Jamie Spicer, did so at a different facility—the Pain Center—in which Dr. Dagley was a part-owner as well. Dr. Dagley described the Pain Center as being "similar to a surgery center."

20

The services and charges at the Rehab clinic and at the Pain Center, he said, were reasonable and necessary.

Regarding the Pain Center, Dr. Dagley explained that doctors usually go to surgery centers or hospitals to do certain procedures because the surgery centers and hospitals have the necessary equipment. In Dr. Dagley's case, however, the Pain Center had the necessary equipment; Dr. Dagley described the Pain Center as a "procedure center attached to our office" but acknowledged that it was not a licensed ambulatory surgical center.

Consistent with that knowledge, Dr. Dagley asserted that the Pain Center billed as a "Place of Service 49"—essentially a doctor's office—and not as a surgery center. Despite billing as a Place of Service 49 and despite not being a surgery center, the Pain Center charged a facility fee, that is, premium add-ons associated with maintaining an emergency-ready facility. *See United Healthcare Servs., Inc. v. First St. Hosp. LP*, 570 S.W.3d 323, 327 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). Dr. Dagley also acknowledged that a Place of Service 49 could not bill independently and separately from the doctor. Finally, although somewhat muddled, Dr. Dagley appeared to agree that, with the exception of anesthesia, there should have been only one billing from his office.

The billing, however, was not from one office. The Rehab clinic and the Pain Center billed separately. When confronted with the Pain Center's separate billing, Dr.

Dagley responded, "Well, I did not make that bill." He asserted that Inman had not yet received any bill for any of her treatment, but he maintained that she was liable for the charges. Notwithstanding the improper billing, Dr. Dagley maintained that the fees themselves were reasonable.

Allen's expert, Dr. DuBois, weighed in on the Pain Center's improper billing too:

> [ALLEN'S ATTORNEY] Q. Let's first address the Cedar Hill Interventional Pain Center.
>
> I'll represent to you that they have answered questions, sworn questions under oath, that they are not a licensed ambulatory surgical center, nor are they—have any certifications whatsoever that they can identify.
>
> [DR. DUBOIS] A. Okay.
>
> Q. So they're not a hospital, and they're not a licensed ambulatory surgical center. And they're billing under a [P]lace of Service 49.
>
> A. Correct.
>
> Q. Are these issues familiar to you?
>
> A. Yes.
>
> Q. Okay. Is it appropriate for any facility bill to be generated by a facility that does not have the licensing of an ambulatory surgical center or hospital in this context, billing under this Place of Service 49?
>
> A. It is my understanding and opinion that is not appropriate for them to be billing. Those facility fees are for places that are registered in the state as either certified, meaning they've bee[n] inspected and proven to be fully capable, hospitals or surgery centers. And that would be a Place of Service 22, as an example.

A 49 is—is an "other," and it's not listed in the state certification. It's not licensed. And it, frankly, doesn't have to undergo any certification. So it's—I used the term earlier "a procedure room." That's as much as it is. It's a—like a doctor's office. It's just they give it this 49, which means "other."

Q. Okay. So in your opinion, the entire bill generated, really, it doesn't have any merit in regard to being paid. It—it's—they shouldn't be generating a bill separate and apart from their own physician's bill, correct?

A. Correct. There is a thing called "correct coding initiative," and there are certified coders and billers that look through these things. And the idea is that, you know, we want to have physicians paid, but we want it to be fair on both counts.

And so if you went into the hospital, which has to be ready for a war and a nuclear attack, they've got to have a lot of staff. They're open 24/7. There's going to be higher fees allowed for the cost of maintaining that kind of thing.

A room in a—in a physician's office or even next door to a physician's office, they're not open 24/7. If a—you know, hurricane, floods, they're not going to be open. They're going to close the doors and head out. They are not allocated extra funds, because they're not as complex.

And so this is an attempt to say they're providing those services and bill for such added services. And in fact, under the correct coding initiative, they would be billed for any such procedures out of what we call the physician's professional component reimbursement.

Q. Okay. So in other words, it should be—for whatever was legitimately done and billed, should be what we've been referring to or I referred to as Dagley's bill or the [Rehab clinic]—

A. Yes. I mean, I've done—I had a procedure room in a clinic, and you know, we would bill. And so you do one of these procedures and you have an amount that—like the federal registry has published

what Medicare and them will pay for such a thing being done in your office or something equivalent.

Dr. DuBois later added, "I think, you know, sensible members of the jury and the community, . . . we all joke about the $10 aspirin in the hospital . . . . And there's a certain amount of markup that we allow because—having [24/7 medical care] around and available."

## 2. Discussion

Dr. DuBois's testimony showed that the services that Dr. Dagley and Dr. Spicer provided to Inman at the Pain Center were coded properly (Place of Service 49) but were billed improperly (by the Pain Center). Dr. DuBois asserted that the services should have been billed as part of the doctors' fees. Dr. Dagley agreed that a Place of Service 49 or code 49 could not bill independently or separately from the doctor and appeared to agree that, with the exception of the anesthesiologist's fee, there should have been only one billing.

Because the Pain Center was not a licensed facility, Allen contends that the $79,226.50 bill generated by the Pain Center thus constituted no evidence of reasonable and necessary past medical expenses. *See Lon Smith & Assocs., Inc. v. Key*, 527 S.W.3d 604, 633–34 (Tex. App.—Fort Worth 2017, pet. denied); *Dohalick v. Moody Nat'l Bank*, 375 S.W.3d 537, 540–41 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *Jackson T. Fulgham Co. v. Stewart Title Guar. Co.*, 649 S.W.2d 128, 132 (Tex. App.—

24

Dallas 1983, writ ref'd n.r.e.); *Holloman v. Denson*, 640 S.W.2d 417, 420 (Tex. App.—Waco 1982, writ ref'd n.r.e). We disagree.

The Pain Center's bill showed both services rendered and the fees for those services, and Dr. Dagley testified that the services and fees were reasonable and necessary. Although evidence showed that the Pain Center could not properly bill for those services, other evidence showed that Dr. Dagley, Dr. Spicer, or the Rehab clinic could. Allen has not cited any authority showing that this correctible billing error vitiated the fact that Inman had received medical services and was liable—if not to the Pain Center, then to Dr. Dagley, Dr. Spicer, or the Rehab clinic—for the fees associated with those services. The evidence showed that the fees could not be recovered as billed but could be recovered if billed in another manner.

The jury reduced the overall requested award for reasonable and necessary past medical expenses by over half (from $125,797.09 to $56,000) and reduced the portion attributable to the Pain Center to about one-eighth of what Inman was asking (from $79,226.50 to $9,429.41). Dr. DuBois's testimony ostensibly took some traction, just not as much traction as Allen contends that it merited.

The jury was free to consider and weigh the evidence, accept or reject expert testimony, and determine the appropriate amount to award as damages. *See Golden Eagle Archery, Inc.*, 116 S.W.3d at 761. Although the jury's calculation is not apparent,

its award falls within the range of damages supported by the evidence; we thus cannot disturb its finding. *See Powell Elec. Sys., Inc.*, 356 S.W.3d at 127.

We overrule Allen's fourth and fifth issues.

### III. NO IRRECONCILABLE CONFLICT IN JURY FINDINGS

Finally, in Allen's sixth issue, she argues that in the jury's answer to Question No. 2a, it awarded Inman $50,000 for past physical pain and mental anguish. However, in its answer to Question 2e, the jury awarded zero dollars for past physical impairment. Allen contends that these answers conflict with each other. Once again, we disagree.

Whether Inman experienced pain and suffering following the collision and whether she experienced physical impairment are two separate questions. *See Dawson v. Briggs*, 107 S.W.3d 739, 752 (Tex. App.—Fort Worth 2003, no pet.). Physical impairment encompasses the loss of the injured party's former lifestyle. *Id.*; *Schindler Elevator Corp. v. Anderson*, 78 S.W.3d 392, 412 (Tex. App.—Houston [14th Dist.] 2001, pet. granted, judgm't vacated w.r.m.), *disapproved on other grounds by Roberts v. Williamson*, 111 S.W.3d 113, 120 (Tex. 2003). Extending beyond the loss of earning capacity and beyond any pain and suffering, it is a separate loss that is substantial or extremely disabling. *Dawson*, 107 S.W.3d at 752; *Dollison v. Hayes*, 79 S.W.3d 246, 253 (Tex. App.—Texarkana 2002, no pet.); *Schindler Elevator Corp.*, 78 S.W.3d at 412. Proving that one is entitled to compensatory damages for pain and suffering or for lost wages

26

does not automatically entitle one to compensation for physical impairment. *Dawson*, 107 S.W.3d at 752. The party claiming physical-impairment damages bears the burden of proving a compensable injury. *Id.*

Inman stated that she had been in a great deal of pain. Despite that, even after the accident, Inman ran. "I'm a runner," she said; "[Running is] what I'm known for. It's who I am." Inman had previously run track for TCU. The farthest that she had ever run was 30 miles on her thirtieth birthday. Her 30-mile run, however, predated the accident.

Evidence suggested that Inman had run a 5K just one month after the accident, but Inman hedged—she did not recall running that particular race, and she speculated that she may have given her "bib" or number to someone else. In any event, she added, "I'm not denying that I tried to run after the accident. I did." Despite her injuries, Inman admitted running 5Ks and 10Ks.

Based on the evidence, awarding Inman damages for past physical pain and mental anguish but not awarding her damages for past physical impairment is not irreconcilably inconsistent. *Id.*; *Schindler Elevator Corp.*, 78 S.W.3d at 412. Both before and after the accident, Inman was a runner.

We overrule Allen's sixth issue.

## IV. CONCLUSION

Having overruled all six of Allen's issues, we affirm the trial court's judgment.

27

                                        /s/ Mike Wallach
                                        Mike Wallach
                                        Justice

Delivered:  December 17, 2020